1

1          IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF HAWAII

3

UNITED STATES OF AMERICA,      ) CR 05-00164 JMS
4                                )
                 Plaintiff,      ) Honolulu, Hawaii
5                                ) August 7, 2006
          vs.                    ) 3:00 p.m.
6                                )
(02) JESUS CACHO,                ) Sentencing to Counts 1 and 2
7                                ) of the Superseding
                 Defendant.      ) Indictment
8    _____ )

9

                TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
                UNITED STATES DISTRICT JUDGE
11

APPEARANCES:
12

     For the Plaintiff:      THOMAS J. BRADY, ESQ.
13                           Office of the United States Attorney
                             PJKK Federal Building
14                           300 Ala Moana Blvd., Suite 6100
                             Honolulu, Hawaii  96850
15

     For the Defendant:      WILLIAM M. DOMINGO, ESQ.
16                           Attorney at Law
                             547 Halekauwila Street, Suite 102
17                           Honolulu, Hawaii  96813
                                  - and -
18                           DAVID A. ELDEN, ESQ.
                             Attorney at Law
19                           11377 West Olympic Blvd., 10th Floor
                             Los Angeles, California  90064
20

     Official Court         Sharon Ross, CSR, RPR, CRR, RMR
21   Reporter:              United States District Court
                             300 Ala Moana Blvd., Room C-283
22                           Honolulu, Hawaii  96850
                             (808) 535-9200
23

24

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

EXHIBIT **F**

1    Monday, August 7, 2006                          3:00 P.M.

2          COURTROOM MANAGER:  Criminal No. 05-00164 JMS, United

3    States of America versus Defendant (02) Jesus Cacho.

4          This case is called for a sentencing as to Counts 1

03:04PM  5    and 2 of the superseding indictment.

6          MR. BRADY:  Good afternoon.  Assistant United States

7    Attorney Tom Brady on behalf of the United States.

8          THE COURT:  Yes, good afternoon, Mr. Brady.

9          MR. ELDEN:  David Elden for Mr. Cacho, who is present

03:04PM 10    in court and in custody, aided by the Spanish-speaking

11    interpreter, Your Honor.

12          THE COURT:  All right.  And Mr. Domingo is here as

13    well, I see.

14          MR. DOMINGO:  Yes, Your Honor.

03:04PM 15          MR. ELDEN:  Oh, I apologize.  No slight, Mr. Domingo.

16          THE COURT:  That's okay, just local counsel.  All

17    right.  Good afternoon to all of you as well.

18          All right.  Well, I have spent considerable time going

19    through this file because it is sort of thick and the

03:04PM 20    objections and so forth.  And I am prepared to go forward

21    today, but I understand the parties have a request to put this

22    off.

23          I will hear from you.  Although, I can tell you I'm

24    generally disinclined to do that, Mr. Elden; but I will hear

03:04PM 25    from you your reasons for wanting a continuance.

3

1          MR. ELDEN:  Thank you, Your Honor.  Based on some of

2     the information I know that the court then has reviewed in my

3     letters with Mr. Muehleck, there was no really grounds for

4     possible cooperation and -- and really not even that, really to

03:05PM 5     get him debriefed -- originally he didn't want to have him

6     debriefed -- for the safety valve.  So --

7          THE COURT:  Speak into the microphone, if you will.

8     Thank you.

9          MR. ELDEN:  Boy, usually it's not that I -- people

03:05PM 10    can't hear me.  That's amazing.

11         So, we have spent the better part of the morning with

12    the agent and getting debriefed.  He has provided -- my client

13    has provided substantial information on that.

14         And I believe that the government's position now is

03:05PM 15    that they want to check that out because essentially there

16    might be no argument as to the extra point for the acceptance

17    of responsibility or the safety valve.

18         THE COURT:  All right.  Well, let me hear from

19    Mr. Brady.  Mr. Brady, are you there yet or are you not there

03:05PM 20    yet as far as the two levels for safety valve based on the last

21    criteria, which is providing you with truthful information?

22         MR. BRADY:  Right.  I would have to say I'm not there

23    yet, Judge; but it's not for a lack of effort on the part of

24    the defendant.

03:06PM 25         I inherited this case from Mr. Muehleck.  At that time

1    the government was taking the position that we were asking, in

2    fact, for an enhancement for obstruction of justice, based on

3    what has happened during his post-arrest debriefing as well as

4    subsequent trial testimony in his wife's case.

03:06PM    5    I -- once got the case, I spoke to counsel.  We -- I

6    spoke to the agent and made it known that the counsel wanted to

7    be debriefed -- his client debriefed.  And after speaking to

8    the special agent involved in this case, he said, sure, we'll

9    do that.

03:06PM    10    We set it up for today.  Quite frankly, I thought it

11    was going to be another situation where the defendant came in

12    and stonewalled and wouldn't provide information and that we

13    could go forward today.  And I think -- I don't know if that

14    was everybody's impression, but that was mine.

03:07PM    15    After talking to the agent just recently within the

16    hour or two, he said, no, in fact, he's provided some good

17    information that I can work with; and if possible, I'd like to

18    give it a try.

19    The -- typically we would say, okay, let's go forward

03:07PM    20    with sentencing; and then let's address this in a Rule 35.

21    However, in this case it actually will involve the safety

22    valve, acceptance of responsibility as well as the government's

23    motion for an upward adjustment.

24    So, with that in mind, I'm concurring with his --

03:07PM    25    THE COURT:  All right.  I still don't understand,

1    though, why we need a continuance.  In other words, if he

2    has -- if your position is he's provided truthful information,

3    I'm prepared to grant safety valve and the third level for

4    acceptance.

03:07PM  5         If you make a motion, I'll grant it.  If you don't,

6    then I won't, I suppose, is the way that works, at least I

7    believe.  I would hear from the defense on that.

8         MR. ELDEN:  I believe that the statute says on the

9    government's motion --

03:07PM 10         THE COURT:  Right.

11         MR. ELDEN:  -- and if they don't make that motion,

12   that would be a substantial amount of time that my client would

13   be enhanced.  I think it's section (b) -- subsection (b).  I

14   have the --

03:08PM 15         THE COURT:  I'm just looking at the report to see

16   if -- that he did only receive the two levels, as it is --

17   stands right now.

18         MR. BRADY:  Yes, Your Honor.

19         MR. ELDEN:  That's right.

03:08PM 20         THE COURT:  So, I'm just trying to figure out,

21   Mr. Brady, what do you need time to do?  I mean --

22         MR. BRADY:  Well, Judge, the conversation I had with

23   the special agent --

24         THE COURT:  He's right here.

03:08PM 25         MR. BRADY:  -- thank you -- was about 30 seconds long.

1    And I just -- I don't know what was discussed.  I don't know

2    what was said.  I am confident in Special Agent Rudow's

3    assessment of the case.  It's just that I don't have enough

4    information at this time.

03:08PM  5            THE COURT:  All right.  Well, you know, this happens

6    more typically in civil cases than in criminal cases.  People

7    come in in the last minute and say, Judge, we need some more

8    time to do this; but I came in this weekend just for this,

9    Mr. Brady.  And you folks could have done this earlier.

03:09PM 10            Now, I'm not blaming you so much, Mr. Elden, because

11    I've read the letters with Mr. Muehleck.  And I don't -- I

12    looked at the law, and I've spent some time looking at the law

13    this weekend.

14            The government can't say, no, we're not going to

03:09PM 15    debrief you because we think you lied in your own trial or

16    someone else's trial when it comes to safety valve.  The case

17    law is clear on that.  You get a clean start if you come in and

18    provide that information.  If you believe he lied, it doesn't

19    matter.

03:09PM 20            Now, that may support the enhancement for obstruction.

21    I'm not saying one way or the other how that plays out, but

22    what I am saying is the basis Mr. Muehleck gave is not a valid

23    legal basis and one that shouldn't have been raised in the

24    first place.

03:09PM 25            If he wants to come in and be debriefed, you have an

03:09PM

obligation to sit down and debrief him.  That's the way the law
is written, even if you think he lied before, because as long
as he gives complete and truthful information as of the day of
sentencing, then he's entitled to the safety valve, even if he
lied before.  That's what the law is.

And so, what I'm saying is you've got to get your act
together well before the morning of sentencing on these
matters, especially when there's a lot of objections in a
report and I spent five to six hours probably just on this
sentencing and then you come in and say let's kick it off until
December.

Now, I'm not going to do anything to prejudice the
defendant here.  I want to make that clear, but the way this
played out isn't very satisfying to the court.  I want to make
myself very clear on that.

MR. BRADY:  Yes, Your Honor.

THE COURT:  Now, what are you suggesting, Mr. Brady?

MR. BRADY:  One of two things:  We can either, with
the court's indulgence, take 30, 40 minutes so I can sit down
with my agent and discuss what has been discussed earlier today
and go forward today or the court can continue this matter in
the normal course.

THE COURT:  All right.  Well, you're not from
Honolulu, obviously, or from Hawaii, Mr. Elden.  What's your
schedule like and what's your -- where do you stand on timing?

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | MR. ELDEN:  Your Honor, we have the time.  I think we                   |
|       | 2  | have a 9:00 -- 9:30 flight.                                             |
|       | 3  | THE COURT:  Tonight?                                                    |
|       | 4  | MR. ELDEN:  Yes.                                                        |
| 03:10PM | 5  | THE COURT:  All right.  Well, Mr. Brady, could you                    |
|       | 6  | make that determination without having talked to any                   |
|       | 7  | supervisors?  I mean, you have that authority to sort of let me         |
|       | 8  | know where you stand on both the third point for acceptance and        |
|       | 9  | safety valve?                                                           |
| 03:11PM | 10 | MR. BRADY:  Yes.                                                      |
|       | 11 | THE COURT:  You're comfortable with that?                              |
|       | 12 | MR. BRADY:  Yes, Your Honor.                                           |
|       | 13 | THE COURT:  All right.  So, let's do that.  Let's take                 |
|       | 14 | a recess and see if you can come to some conclusion on that.           |
| 03:11PM | 15 | I'm disinclined a continuance, though, for cooperation                |
|       | 16 | purposes.  I mean, if substantial assistance follows from              |
|       | 17 | what's happened here today -- because as I understand, talking         |
|       | 18 | to Ms. Miwa, that may be part of what goes on here, too;               |
|       | 19 | although, I'm not real sure, it's not clear to me -- that could        |
| 03:11PM | 20 | come by rule -- by way of motion at a later date.                     |
|       | 21 | MR. BRADY:  That's correct.                                            |
|       | 22 | THE COURT:  All right.                                                 |
|       | 23 | MR. ELDEN:  That's correct.                                            |
|       | 24 | THE COURT:  Do you have any issues with that, sir?                     |
| 03:11PM | 25 | MR. ELDEN:  That is, I think, the state of the law,                   |

1    Your Honor.

2           THE COURT:  Okay.  All right.  So, we'll go into

3    recess; and then you folks can let me know when you're ready.

4           If we can't proceed today for some reason, if you're

03:11PM  5    going to need more debriefings in order to make a

6    determination, you can let me know that land we'll talk about

7    rescheduling.

8           MR. BRADY:  Thank you.

9           THE COURT:  Okay?

03:11PM 10           MR. ELDEN:  Thank you, Your Honor.

11           (Recess at 3:11 p.m., until 3:40 p.m.)

12           THE COURT:  All right.  We're back on the record with

13    all counsel and the defendant and the case agent.

14           All right.  Mr. Brady, where do we stand then on this

03:40PM 15    issue?

16           MR. BRADY:  Your Honor, the government is prepared to

17    make some adjustments to the presentence report regarding

18    safety valve as well as acceptance of responsibility; and we

19    are also orally moving to amend our sentencing statement.  We

03:40PM 20    are no longer requesting a two-level upward adjustment based on

21    obstruction.

22           THE COURT:  All right.  Very well.  So, let me -- are

23    we prepared to move forward then with those agreements?

24           MR. BRADY:  Yes, Your Honor.

03:40PM 25           MR. ELDEN:  Yes, Your Honor.

1          THE COURT:  All right.  All right.  So, first, let me

2     ask the defendant and his counsel if they've both had then a

3     full opportunity to read, review and discuss the presentence

4     report and make any and all objections subject to these oral

03:41PM   5     agreement modifications today to the report.

6          MR. ELDEN:  Yes, Your Honor.

7          THE COURT:  All right.  Is that right, sir?

8          THE DEFENDANT:  (In English)  Yes, Your Honor.

9          THE COURT:  All right.  Thank you.  You may be seated.

03:41PM  10          On December 5th of last year Mr. Cacho pled guilty to

11     both counts of the two-count superseding indictment charging

12     him with conspiracy to distribute and possess with intent to

13     distribute 50 grams or more of methamphetamine.  There is no

14     plea agreement in this case.

03:41PM  15          I am accepting the presentence report and placing it

16     in the record under seal.  If an appeal is taken, counsel, of

17     course, will have access to that report other than the

18     confidential recommendation section.

19          Now, there have been various letters in support which

03:41PM  20     have been submitted; and for the record, I have reviewed those.

21          All right.  Mr. Brady, then I understand you're

22     withdrawing the request for a two-level enhancement for

23     obstruction of justice?

24          MR. BRADY:  That is correct.

03:41PM  25          THE COURT:  All right.  And with that withdrawal, are

1    there any other objections remaining that you have either as to

2    the factual statements in the report or the calculations as to

3    the guidelines, understanding that you're now agreeing to two

4    points off for the safety valve and are orally moving for a

03:42PM  5    third level reduction for acceptance of responsibility?

6              MR. BRADY:  With those in mind, no others.

7              THE COURT:  All right.  Turning to you then,

8    Mr. Elden, do you have any remaining objections to either the

9    guideline -- the factual statements contained in the report or

03:42PM 10    the guideline calculations?

11              MR. ELDEN:  No, Your Honor.

12              THE COURT:  All right.  So, let us go through this

13    then with the help of probation, perhaps, so we're all on the

14    same page as to exactly where we are.

03:42PM 15              As I understand it then, we'd -- with application of

16    the safety valve, the total offense level would be 32; but then

17    we also have a third level for acceptance of responsibility

18    bringing it down to a 31, criminal history category I; is that

19    correct?

03:42PM 20              PROBATION OFFICER:  Yes, Your Honor.

21              THE COURT:  All right.  Then the advisory guideline

22    range, as I understand it, for a level 31, criminal history

23    category I, is 108 to 135 months?

24              PROBATION OFFICER:  Yes, Your Honor.

03:43PM 25              THE COURT:  Supervised release of five years?

1          PROBATION OFFICER:  Three to five years --

2          THE COURT:  Three to five years.

3          PROBATION OFFICER:  -- with safety valve, Your Honor.

4          THE COURT:  And then what -- where is the fine range

03:43PM  5  now?

6          PROBATION OFFICER:  15,000 to $4 million.

7          THE COURT:  All right.  And a $200 special assessment;

8  is that accurate?

9          PROBATION OFFICER:  Yes, Your Honor.

03:43PM 10  THE COURT:  All right.  Do all parties concur then

11  with those ranges?  And, of course, there is no mandatory

12  minimum that applies because of the application of the safety

13  valve.

14          MR. ELDEN:  That is correct, Your Honor.

03:43PM 15  MR. BRADY:  Yes, Your Honor.

16          THE COURT:  All right.  Now, I did want to raise one

17  issue with the defense before we go further; and that is a

18  concern I had regarding the failure to -- as set forth in

19  paragraph 70 of the report and that is that Mr. Cacho declined

03:44PM 20  to comment on his financial condition, his financial status.

21          Now, my review, Mr. Elden, of the law on this -- now,

22  I understand the guidelines are no longer mandatory; but the

23  language of the guidelines which are advisory state that the

24  court shall impose a fine in all cases except where the

03:44PM 25  defendant establishes that he is unable to pay and is not

1    likely to pay or be able to pay a fine.  Clearly the burden is

2    on the defendant under controlling Ninth Circuit law.

3         So, it is my intent to impose a fine perhaps at the

4    minimum of the range; but nonetheless, it is my intent to

03:44PM  5    impose a fine.  So, I did want to mention that to you.  And I

6    will certainly hear from you on that; but what I would do at

7    this point in time, Mr. Elden, is turn to you and hear from you

8    and then your client, if he wishes to speak, and then from

9    Mr. Brady.

03:44PM 10         MR. ELDEN:  Thank you, Your Honor.  I don't know what

11    the position is on -- we argue from here or --

12         THE COURT:  I can sometimes hear better from up here.

13    And for the record, then, I am adopting the factual statements

14    contained in the presentence report and the application of the

03:45PM 15    guidelines to those facts as agreed upon by the parties and

16    agreed by the court as my own findings as well.

17         All right.  Mr. Elden?

18         MR. ELDEN:  Your Honor, I think probably the first

19    thing, since it's the last thing the court brought forward --

03:45PM 20    boy, I'm -- usually people don't have problem hearing me.

21         THE COURT:  It's not that.  It's the court reporter

22    can't hear you with the headphones on unless you're speaking

23    into the microphone.

24         MR. ELDEN:  Okay.  Can you hear me?  She's smiling.

03:45PM 25    Okay.

1          Your Honor, as to paragraph 70 and the fine, I think

2    that you sat through the trial.  You saw Jesika testify.  You

3    saw my client testify.  I think you've seen the letters and the

4    care and the feeling that each of them have, and I think the

03:45PM  5    court can notice that she is not here today.  She is not here

6    today because they didn't have the money.  She has no money to

7    come.

8          THE COURT:  That's not in the record, Mr. Elden; and

9    what you're telling me is not evidence.  I'm not going to take

03:46PM 10    that as --

11          MR. ELDEN:  Okay.  I just was -- as to paragraph 70,

12    that's my only issue --

13          THE COURT:  All right.

14          MR. ELDEN:  -- as to paragraph 70.

03:46PM 15          THE COURT:  All right.

16          MR. ELDEN:  But I would like the court to note that

17    she is not here, and I think you could tell the love between

18    them because that was going to be part of my argument.

19          THE COURT:  I don't doubt that, Mr. Elden; but I can't

03:46PM 20    take as a fact that she's not here because she couldn't afford

21    to travel.

22          MR. ELDEN:  Okay.  Your Honor, I have asked for 84

23    months.  I think now that we're down to 108 months minimum

24    based on the guidelines, I think I'm going to ask you to look

03:46PM 25    at this person as an individual, look at what he's done in his

1  past, look at how he has helped people.  I think you have

2  numerous letters from family members and people where -- the

3  area where he was raised, there's hurricanes, how he

4  volunteered his time, how he helped with supplies, how he

03:47PM  5  helped rebuild houses, how he did any number of things in

6  his -- as -- when he was younger.

7        But I think that this case is more really about Jesika

8  and the family that he didn't start but that he married into

9  and the love that he had for those kids, watching one of her

03:47PM 10  sons, Christian, die of brain cancer, not being able to be

11  there, helping with the funeral expenses, as some of the

12  letters have explained.  I think the court can get a sense of

13  who this person is as a man, as a human being.

14        I would indicate to the court that this is his first

03:47PM 15  arrest.  And I think that most of the factual basis as it

16  relates to -- to his involvement in this case, he is on the

17  lower end.  He's a person that does the deliveries.

18        When you see in the reports in the different

19  paragraphs that relates to Alex would tell the agent when he

03:48PM 20  was talking to the agent, don't tell him how much it is and

21  really making sure that he was out of the loop, that Alex'

22  normal delivery person in Southern California wasn't available

23  and he was sending Mr. Cacho.  I don't --

24        THE COURT:  Okay.  But we also know from the trial

03:48PM 25  testimony of your client -- and you admit this in your own

1    papers on the now withdrawn request for the two levels -- that

2    he was involved in drug dealing -- although, the precise extent

3    of it is unclear -- with this person he identified as Juan, I

4    believe, which --

03:48PM  5         MR. ELDEN:  That is --

6         THE COURT:  -- by his own testimony is someone

7    different than Viejo a/k/a Trick.

8         MR. ELDEN:  Your Honor, that is -- as it was cleared

9    up today in the debriefings, there are two people.  And I am

03:48PM 10    not asking you for a two-level departure.  I'm asking you just

11    to assess this in the overall view of him as an individual in

12    that even when he was dealing with Juan, he was still a

13    lower-level lower echelon people.  I don't know if he gets the

14    two levels; but he is not some master mind, the guy who owned

03:49PM 15    the drugs and was selling them and was making a profit.  He was

16    getting paid as -- as they say in LA, as the schlepper, as a

17    delivery guy as -- running errands and making the deliveries.

18    That's how -- the evidence then came out at trial.

19         He told the agent today what he did do.  He explained

03:49PM 20    the involvement with Juan.  He explained the involvement with

21    Trick, and I think it was established that Trick is also Viejo.

22    It is another name that would be used kind of as slang, but

23    it's -- I've talked to the interpreter.  I've talked to -- I

24    think it got straightened out at the trial; but anyway, it's

03:49PM 25    been straightened out.  So, the -- Juan is one person, and

17

1    Trick and Viejo are the -- one and the same people.

2    THE COURT:  Right.  And that's consistent with your

3    client's testimony at his wife's trial.

4    MR. ELDEN:  Yeah.  So, I'm asking the court for the

03:50PM  5    additional -- I don't want to say downward departures because I

6    think under the new sentencing guidelines, you don't have to

7    look at them in terms of departures.  I think that the court

8    can assess its interpretation and its feelings towards what

9    should be a proper punishment for somebody who's before the

03:50PM  10    court for the first time, incarcerated for the first time.

11    And I would ask the court to sentence down at a level

12    that would be -- give him 81 months, which is still a

13    substantial period of time for somebody to spend in jail for

14    his very first arrest.

03:50PM  15    THE COURT:  All right.  Thank you.

16    Mr. Cacho, this is your opportunity to address the

17    court and let me know any information you believe is relevant

18    in any way.

19    THE DEFENDANT:  (In English)  Well, can you hear me?

03:51PM  20    Okay.  I just want to say I'm sorry I -- I'm very sorry for

21    leaving my wife alone and thank you.

22    THE COURT:  All right.  Thank you, sir.

23    All right.  Mr. Elden, you may sit back down, if you

24    would, please, so I can see Mr. Brady.  Thank you.

03:51PM  25    All right.  Mr. Brady?

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | MR. BRADY:  Judge, the government is respectfully            |
|        | 2  | requesting that this court, after considering in the record the |
|        | 3  | presentence report, the factors of 18 USC Section 3553(a) and |
|        | 4  | the advisory sentencing guidelines, impose a sentencing of 120 |
| 03:51PM | 5  | months of incarceration.  We are asking for five years      |
|        | 6  | supervised release, all to run concurrent, as well as a $15,000 |
|        | 7  | fine and a special assessment of $200.                       |
|        | 8  | As to the factors of 18 USC 3553 --                          |
|        | 9  | THE COURT:  Mr. Brady, can I -- I'm going to let you        |
| 03:52PM | 10 | finish.  I just have a question I want to ask; and if you need |
|        | 11 | to speak to Mr. Rudow about this, you can but --             |
|        | 12 | MR. BRADY:  Yes.                                            |
|        | 13 | THE COURT:  -- I understand the two levels -- your         |
|        | 14 | request for obstruction has been withdrawn.  And I'm not     |
| 03:52PM | 15 | questioning that in any way because I think even if there was |
|        | 16 | false testimony, the materiality question is a very difficult |
|        | 17 | one, given the jury's verdict and really an overwhelming lack |
|        | 18 | of evidence in that case against Mrs. Cacho.  I mean, it was a |
|        | 19 | very difficult case for the government to win, if not        |
| 03:52PM | 20 | impossible, sort of out of the box on that case.  So, the real |
|        | 21 | issue is materiality regardless.                            |
|        | 22 | So, I wouldn't question I would have agreed with you,       |
|        | 23 | Mr. Elden, on that had the government persisted, if nothing  |
|        | 24 | else, on the materiality prong on it.  But after discussing  |
| 03:52PM | 25 | matters with Mr. Cacho, that is, after Agent Rudow was able to |

1   sit down with him today, I'm just wondering -- and if you feel

2   you can't answer, I'll accept that; but I'm wondering if the

3   government's position that he provided false or at least some

4   extremely self-serving testimony is still the fact, I'd like to

03:53PM  5   know that and on what you base it, if you do believe that.

6           MR. BRADY:  We did discuss that with the -- I did

7   discuss that with the agent.  And to be honest, I am not

8   prepared to -- to make an assessment to this court whether or

9   not he was truthful at -- at that trial.

03:53PM  10          I am prepared to argue that he was not truthful during

11   his initial debrief after his arrest.  I am not satisfied that

12   he was truthful during his trial testimony of his wife for a

13   lot of reasons; but one of the reasons is he's had a lot of

14   time to fit things in -- into place, to sit back and look at

03:53PM  15   his trial testimony and look at what he's said in the past and

16   kind of make it all fit without -- without appearing to be

17   dishonest.

18          THE COURT:  I mean, the one thing I never understood

19   in the trial testimony -- Mr. Elden, if you want to address

03:53PM  20   this, I'll certainly allow it; and you can talk to your client

21   and address it if you want but -- and I'm not going to apply

22   two levels for obstruction.  Let me make that clear.

23          This is just an issue of looking at 3553(a) where --

24   how I view this.  And I think it is an important issue.  He

03:54PM  25   testified, as I understand it -- and there was some confusion,

1    and I will accept in part, Mr. Elden -- and I think you did a

2    very good job in your paper making me think of something I

3    wouldn't have thought of before, which is he was never really

4    subject to cross-examination -- or to examination, I'm sorry,

03:54PM 5    by his own counsel on these matters to clarify.  There wasn't

6    sort of the same interest to clarify that you normally would

7    see to be able to put into perspective what someone stated

8    because Mrs. Cacho's attorney may have thought leave it alone.

9    I'm not going to -- I'm not going to go there, for whatever

03:54PM 10    reason.  Whereas, if it was your own client on the stand,

11    Mr. Elden, you may have felt I need to have this clarified in

12    order for the jury to understand it.

13         And so, I think that is important.  And there was an

14    interpreter.  It does seem there was some confusion, I grant

03:54PM 15    you that.  But I remember -- and you weren't here -- Agent

16    Rudow and Mr. Cacho -- and I'm not sure if Mr. Domingo was here

17    at the time; but I remember Mr. -- vividly Mr. Muehleck's

18    closing argument where he took out bag after bag after bag

19    after bag.  And it was sort of a Hollywood production about the

03:55PM 20    number of bags that were found in the garage in this gym bag.

21    And it was effective in the sense of there were a lot of them.

22         And as I recall, those bags -- and the agent can

23    correct me if I'm wrong on this -- those bags were -- had been

24    opened and had residue in them or at least many of them did or,

03:55PM 25    if not, most of them.

1           And so, the argument that Juan simply left his garbage

2    in the garage doesn't ring true to me.  And so, that's where I

3    have some concerns, just so I can -- we can talk this through,

4    in the testimony.

03:55PM  5           The rest of it, I think, is sort of minor and

6    explainable and understandable to a certain degree; but to the

7    extent he was saying I just allowed Juan to use my garage to

8    keep his rubbish, so to speak, is where I have some difficulty.

9    And as I recall, he did admit that the drugs in the third

03:56PM 10    bedroom -- ultimately he admitted were his during the course of

11    that testimony, as I recall.  And he did admit that he did

12    engage in some way -- although, it was a little unclear -- with

13    Juan in the drug trade.  So, that's --

14           MR. BRADY:  I agree with the court.

03:56PM 15           THE COURT:  -- those are where my concerns are.  I'll

16    hear from both sides on that.

17           MR. BRADY:  Well, I agree with the court.  And I also

18    agree with counsel.  And the court's assessment of that is that

19    it was left ambiguous, and obviously the government was able to

03:56PM 20    argument that -- that there was some deniability going on, that

21    there was some contradicting going on by Mr. Cacho.  And that's

22    why I'm not prepared to come out today and say, no, in fact,

23    his testimony rings true to me, and we're -- we're finding it

24    consistent with what he's debriefing and telling us now.

03:57PM 25           I'm not prepared to do that, but what I am prepared to

1    do as far as the factors on 18 USC 3553 is tell the court,

2    well, here is something that we're dead on agreeing on as far

3    as the government's position; and that is that he lied during

4    his initial debrief.  And we think that is a reason why he

03:57PM  5    should get the 120 months as opposed to the low end of the

6    guidelines.  Although, they were only advisory.

7        In making our recommendation, we are -- we're

8    considering the nature and the circumstances of the offense.

9    This defendant was a drug trafficker who was dealing in large

03:57PM  10   volumes of methamphetamine, two pounds being fronted to the

11   agent, who was a stranger he had known for -- hadn't known at

12   all.  And the purity involved was 99 percent.

13       This is a defendant who also engaged in discussions

14   that larger amounts of methamphetamine would be available, up

03:58PM  15   to four pounds, once payment was made on the initial two

16   pounds.  This is an individual who had an additional pound of

17   methamphetamine in his home.  That, too, was of high purity, 99

18   percent.

19       All of the amounts of the drugs associated with this

03:58PM  20   case clearly indicate this was not a small-time dealer or

21   somebody who supported his own drug addiction but, rather,

22   somebody who was profiting as he's made known.

23       In addition to that, the government has considered the

24   history and characteristics of the defendant.  And I have to

03:58PM  25   say he has been dishonest with the government.  He was

1    dishonest in providing a false statement to the FBI on his

2    initial arrest.  He told the FBI that he didn't have any drugs

3    at his place.  Obviously, we found drugs there.  There was a

4    large amount of drug paraphernalia which supported a

03:58PM  5    large-scale drug distribution.

6         He provided false testimony, we believe, regarding his

7    father.  His father had fingerprints on the methamphetamine on

8    the bag that was in the guest room.

9         So, those are the factors that we're focusing on under

03:59PM  10    18 3553 that suggest that this should not be

11    a low-end guideline decision but, in fact, should be in the

12    middle of the range.

13         We're also suggesting that because he's not explained

14    as to why he's engaged in drug trafficking, it appears to be

03:59PM  15    for the pure agreed, for profit.  Again, this is not somebody

16    who was saying he was making these -- or facilitating these

17    drug deals because he was trying to cover his own costs and he

18    was an addict himself.  This isn't a case in which he's engaged

19    in drug trafficking to provide food and housing for his family.

03:59PM  20         This is a man who had a -- supposedly a legitimate

21    business in computers and was making enough money where he

22    didn't need to engage in illegal activity.  This is an

23    individual who has a car, a VW Touareg, that was $45,000.

24    That's a lot nicer than my car.

04:00PM  25         This is an individual that did not appear to need to

1    engage in this for providing food for his family but, rather,

2    appeared to engage in it for the pure profit alone.

3           Those are the factors that we're suggesting to the

4    court would -- would not support a low-end range sentence here,

04:00PM  5    and that's why we're asking for 120 months.

6           THE COURT:  All right.  Thank you, Mr. Brady.

7           Mr. Elden, I did tell you I would hear from you on

8    this issue of the trial testimony --

9           MR. ELDEN:  Thank you, Your Honor.

04:00PM  10           THE COURT:  -- which did include -- and Mr. Brady

11    reminded of this -- did include that his father wasn't involved

12    in any way; but there was that fingerprint on -- as I believe,

13    it was the baggy, as I recall, the outer bag itself.

14           MR. ELDEN:  It was a brown paper bag, Your Honor.

04:00PM  15           THE COURT:  That's where the print was?

16           MR. ELDEN:  The fingerprint was on a brown paper bag.

17    Now whether -- I wasn't at the trial -- whether the brown paper

18    bag -- the drugs were in the brown paper bag or the brown paper

19    bag was there, I don't have an independent recollection.

04:01PM  20           THE COURT:  All right.  As I recall, there was a

21    laundry basket and there was a brown paper bag and then the

22    drugs were inside the brown paper bag.

23           MR. ELDEN:  Okay.  Your Honor, let -- a couple of

24    things:  Let's first talk about his drug dealing in dealing

04:01PM  25    with the agent.  My understanding, from reading the transcript

25

1    from -- my understanding from reading the transcript of the

2    trial and from the probation report in the different paragraphs

3    in the probation report, the agent was dealing with an

4    individual by the name of Alex, who we have identified further

04:01PM  5    in -- in the debriefing and -- who Alex is.

6            Alex was quite specific with the agent to not deal

7    with Mr. Cacho because Mr. Cacho was basically his delivery

8    boy, to make things short.  And I think that that's

9    substantiated in the probation report, in the facts of the

04:02PM 10    case, and I believe that was also, as I recollect, testified at

11    the trial.

12            So, when the government starts arguing about he's in

13    this and he's a large drug dealer, he's delivering a package.

14    That's what he's doing, and he's getting paid to deliver a

04:02PM 15    package.  He's a mule in that sense.

16            The bags present an interesting question, Your Honor.

17            THE COURT:  I'm sorry.  The what?

18            MR. ELDEN:  The bags, the bags in the garage that were

19    in the gym bag --

04:02PM 20            THE COURT:  Okay.

21            MR. ELDEN:  -- and I think that in the debriefing

22    today, Mr. Cacho, I think, explained the bags sufficiently to

23    the agent as to how that occurred.

24            And you've put me in the position that I don't exactly

04:02PM 25    know how to explain it to the court because I would be giving

26

1    the court information that I don't know if the court should

2    have.  I can explain it to the court if the court will tell me

3    it won't use it at sentencing.  I'd be very happy to explain it

4    because I think it should be explained.

04:03PM  5          THE COURT:  Whoa, whoa, whoa, whoa.  Wait a minute.

6    Wait a minute.  What is there that gives some sort of immunity

7    to a statement that your client makes to the government in an

8    attempt to obtain safety valve?  I don't know of anything that

9    protects that information.

04:03PM 10          MR. ELDEN:  Then, Your Honor, I'll be very happy to

11   explain it to the court.

12          THE COURT:  Well, it's a legal issue, though.  And I'm

13   willing to figure that out, but what I heard you saying is he

14   said something that you don't want me to consider for purposes

04:03PM 15   of sentencing but I should consider in determining whether or

16   not he qualifies for the safety valve, essentially.  And I

17   don't know that the law cloaks in any way --

18          MR. ELDEN:  My understanding -- and I haven't -- I

19   don't have a case to give the court.  But my understanding is,

04:03PM 20   now that I think about it, the court can be apprised of what is

21   said in the safety valve; but the court should not use the

22   information provided in the safety valve at the time of

23   sentencing.  But I think it's there just to inform the court.

24          I think that that's my recollection of the law; but

04:04PM 25   I'm not positive on that, Your Honor.

1          THE COURT:  Mr. Brady, do you -- are you aware?

2          MR. BRADY:  No.  I am aware of the letters that the

3     government usually provides in people that are debriefing prior

4     to actual trial, but that's not the situation we have here.

04:04PM   5     There's no agreement between the parties.  And I understand the

6     concept of what counsel is trying to discuss, but it seems to

7     be in a different context that that would apply and not in a

8     debrief for safety valve.

9          THE COURT:  Well, we could take a further recess and

04:04PM  10     do some research, I suppose; but I'm -- I'm concerned about a

11     concept that says that in order to get one break under the

12     guidelines, you know, you have to go talk to the government,

13     but that information can't be used then -- you know, if used by

14     defense counsel, at a minimum, to sort of explain a potential

04:05PM  15     inconsistency, it can be used for that purpose only but not

16     used against the defendant.

17          So, it seems to me you've got to make a decision

18     whether it's appropriate for me to consider in toto or don't

19     provide it to me.

04:05PM  20          MR. ELDEN:  I think that the court is concerned enough

21     about it that I would like to tell you --

22          THE COURT:  All right.

23          MR. ELDEN:  -- but I think I need to talk to my

24     client, if I could, just for a moment, Your Honor.

04:05PM  25          THE COURT:  You certainly may.

1                  (Counsel and the defendant confer.)

2            MR. ELDEN:  Your Honor, I've conferred with my client;

3      and I'm going to explain to you about the bags.

4            Juan Hernandez is a person that my client worked for

04:05PM  5      in distributing methamphetamines.  And pursuant to that, at one

6      point Juan Hernandez needed a place to repackage or whatever

7      the drugs.

8            My client was not even in the country.  He and his

9      wife, I believe, were in Mexico at the time.  He gave Juan

04:06PM 10      permission to go into his garage.  And when my client got back,

11      those bags and whatnot were in the garage.  He picked them up,

12      and he put them into his duffle bag and really just kind of

13      forgot to throw them away.

14            The drugs -- and I'm telling you that he was working

04:06PM 15      for Juan Hernandez and made deliveries for Juan Hernandez.  He

16      has disclosed that to the government in these debriefings

17      today.

18            And that extra -- the drugs that were found in the

19      house in the hamper, Juan had some kind of an emergency and

04:06PM 20      said, can I put those -- can I -- can you store these?  I've

21      got to go back to Mexico.

22            He stored them.  Actually, Juan was supposed to come

23      pick them up the date that they served the search warrant is my

24      understanding.

04:07PM 25            So, that is -- but it makes more sense if, in fact,

1    the court is aware that he had an ongoing relationship.  It

2    isn't just like Juan came over one time and said, oh, can I use

3    your garage?  That isn't -- that isn't the case.

4          He has made full disclosure to the government as it

04:07PM 5    relates to that, Your Honor.

6          THE COURT:  All right.  Very well.  Okay.

7          MR. ELDEN:  I think that that kind of -- I'm hoping

8    that clears it up for the court.

9          THE COURT:  Okay.

04:07PM 10          MR. ELDEN:  Your Honor, the only other thing that the

11    court is arguing regarding 3553(a) is the -- that he is this

12    big drug dealer, Your Honor.

13          There was a lot of drugs that were being distributed.

14    The conversations as it relates to the conspiracy were between

04:07PM 15    the agent and Alex.  My client has actually never met Alex.  My

16    client's contact and how he got involved in this was with a

17    person that was identified at the trial named Trick.

18          We have provided the government with Trick's full

19    name, his -- copy from his Mexican driver's license, which we

04:08PM 20    were able to get from Mexico.  So, he has been fully

21    identified.

22          And these -- I believe, if I recollect correctly, I

23    think that Alex and Trick worked together or Trick might have

24    been Alex's supervisor.  I'm not sure how that really worked

04:08PM 25    because my client didn't know how that really worked, but I

1    think that the testimony and the transcript at the probation

2    department basically indicate that Alex is doing everything to

3    make sure that my client really doesn't know what's going on or

4    isn't dealing with the money.  And that is, in fact, what

04:08PM  5    happened.

6         THE COURT:  All right.  Okay.  Well, what I will do is

7    sort of go through my findings after review of the 3553(a)

8    factors.  Then I'll state my intended sentence at that point in

9    time.

04:09PM 10         Now, of course, I have determined -- and there's

11   agreement -- as to the applicable advisory guideline range at

12   this point.  The court has made that determination.  And under

13   Ninth Circuit law, that is, of course, a starting point only.

14   And I must consider all of the 3553(a) factors, not just the

04:09PM 15   guidelines, in arriving at a sentence.  And an informed

16   sentence is one that can be reached only after a full and fair

17   consideration of all of the 3553(a) factors.

18         Now, I don't intend to go through each of these

19   factors individually necessarily, each and every one; but I

04:09PM 20   have, for the record, considered each of them.

21         And looking at 3553(a)(1), which includes the nature

22   and circumstances of the offense and the history and

23   characteristics of the defendant, looking at the history and

24   characteristics of the defendant, I believe both counsel are

04:10PM 25   right in large part.  And that is, I do believe that there is

1    some background to this individual that I saw in the letters to

2    the court that speak favorably about his background and some of

3    his prior dealings and what he has accomplished in his life.

4              On the other hand, when I look at the post-arrest

04:10PM  5    conduct, I don't think there is any question but that he

6    provided false testimony to -- to the agents.  And so, that

7    is -- obviously works against him when looking at the 3553(a)

8    factors.

9              In the offense itself, I agree with the government

04:10PM 10    that there was a large amount of methamphetamine involved here.

11    And I don't buy the claim that he was ignorant, if, in fact,

12    that was a claim being made, as to the amounts of drugs

13    involved.

14              Paragraph 15 of the report reflects that during a

04:11PM 15    meeting on April 13th of 2005, Mr. Cacho -- I believe it was

16    that same date, that's the date that the paragraph starts

17    with -- told the undercover that he would supply the undercover

18    with an additional four pounds of methamphetamine after the

19    undercover had paid for the two pounds and arranged to meet in

04:11PM 20    California the following week for the payment.

21              So, that reflects to me that Mr. Cacho was very well

22    aware of the size of the amounts, the quantities, I should say,

23    of the methamphetamine that were being distributed.  This isn't

24    a case where I believe that it is even possible that Mr. Cacho

04:11PM 25    believed he was providing the un -- the agent, you know, one

1    ounce or two ounces or some relatively smaller quantities of

2    methamphetamine.  Through his own comments, that does not

3    appear to be an accurate depiction.

4           Now, I'm not sure of the law.  I will not consider and

04:12PM 5    hold against Mr. Cacho the proffer made as to what he stated

6    today; but just looking at the testimony itself in the trial of

7    Mrs. Cacho, Mr. Cacho admitted to having dealt previously with

8    Juan.

9           And the transcripts -- of course, I was the trial

04:12PM 10   judge in that case.  And I have reviewed the transcripts that

11   have been provided to me.  When he was asked about those bags

12   that we've all been talking about that were in the gym bag, he

13   testified he kept them for Juan who was a friend from Tijuana,

14   that he acknowledged that Juan was in the drug business and he

04:13PM 15   said he would keep them for him.

16          When I was not there at home, I allowed him to come

17   into my garage.  And he was asked, question:  "You allowed Juan

18   to keep drugs in your garage?

19          Answer:  "In that occasion."

04:13PM 20   Question:  "How long did you let him -- let him do

21   that, eight months, ten months?"

22          "Six months before my arrest."

23          And then although he then seemed to deny that he was

24   involved in the drug trade with Juan, he comes back and is

04:13PM 25   asked, "Did Juan pass the drugs to you?"

1         Answer:  "I would help him to do that."

2         "You would help him distribute drugs?"

3         Answer:  "Yes."

4         "How long did you do that?"

04:13PM  5         Answer:  "Three months before my arrest."

6         And then he explained that he helped him in driving,

7   which was a little -- left hanging.  It wasn't real clear what

8   he meant by that.

9         So, just looking at the transcript itself and

04:13PM 10  recalling the testimony, I'm not finding that Mr. Cacho

11  testified untruthfully.  I think there's enough of a question

12  there.  I'm not going to reach that, but I do believe that it

13  shows that he had engaged in the drug business beyond that

14  which Agent Rudow had learned through the investigation.

04:14PM 15        Another troubling aspect here is the international

16  nature of this crime.  It appears clear that drugs originated

17  in Mexico and were brought across the border.

18        Paragraph 14 of the report reflects that Mr. Cacho

19  stated that he had a legitimate job working with computers that

04:14PM 20  had somehow given him a special designation that allowed him to

21  travel across the United States/Mexican border on a regular

22  basis.  And apparently he had stated he was going to have the

23  DVDs containing -- I believe it was money, if I'm not mistaken,

24  machines -- the DVDs recorders or players in plain view when he

04:15PM 25  crossed the border.

1          And that suggests to the court that he felt a level of

2     comfort because of the ability he had to cross that border

3     through this special designation.

4          So, looking at all of those factors that speak to the

04:15PM   5     3553(a)(1) considerations as well as the 3553(a)(2)

6     considerations that the need for the sentence imposed to

7     reflect the seriousness of the offense, to promote respect for

8     the law and provide just punishment, along with affording

9     adequate deterrence and protecting the public from further

04:15PM  10     crimes, the court believes -- if you could rise, please, I'll

11     state my intended sentence -- that a reasonable sentence

12     here -- and this takes into account the mitigating factors,

13     including the fact there is no criminal history here

14     whatsoever.  A reasonable sentence is at the bottom of the

04:16PM  15     guideline range of 108 months.

16          Now, I don't want that to be read to mean -- when I

17     say at the bottom of the range, that I'm treating that as

18     presumptive.  What I'm doing is considering the guidelines and

19     the other factors in determining 108 months is the appropriate

04:16PM  20     and the reasonable sentence here to be served concurrently --

21     the two counts to be served concurrently; four years of

22     supervised release, likewise, to be concurrent.

23          Now, as to the fine, I do believe that even

24     post-Booker, the burden should remain on a defendant to prove

04:16PM  25     that he is unable to pay a fine.  In this case -- and that

1    certainly was pre-Booker law under the guidelines and in the
2    Ninth Circuit.  Here between 1990 and 2005, Mr. Cacho was
3    self-employed and, by his own admissions, earned between five
4    to six thousand per month.  At some point, at least, he had
04:17PM  5    three employees working under him.

6         It is also clear to the court that he had to have been
7    making money from his drug trade.  And we do know that he was
8    not truthful to the agents regarding the scope of his drug
9    activity when initially arrested.

04:17PM 10         So, I do fine that once released from prison, given
11    his skills, that he will be marketable and certainly much more
12    marketable than the typical offender here in Federal Court.
13    So, given that the defendant has not attempted to establish to
14    any degree that he's unable to pay a fine, the court will
04:17PM 15    impose a fine of $15,000.  There is no restitution applicable
16    here, and a $200 special assessment.

17         And then, Mr. Cacho, when released from prison, you
18    would be placed under the following conditions of supervision:
19    First, that you abide by the standard conditions of
04:17PM 20    supervision; second, you not commit any crimes, federal, state
21    or local; third, that you not possess illegal controlled
22    substances; four, that you cooperate in the collection of DNA
23    as directed by the probation officer; five, that you refrain
24    from any unlawful use of a controlled substance and submit to
04:18PM 25    one drug test within 15 days of commencement of supervision and

1   at least two drug tests thereafter, but no more than 15 valid

2   drug tests per month during the term of supervision; six, that

3   you not possess a firearm, ammunition, destructive device or

4   any other dangerous weapon; seven, that you participate in and

04:18PM  5   comply with substance abuse treatment, which includes drug and

6   alcohol testing, in a program approved by the Probation Office.

7   And you shall refrain from the possession and/or use of alcohol

8   while in such a program.

9         You shall execute all financial disclosure forms and

04:18PM 10   provide the Probation Office and the Financial Litigation Unit

11   of the U.S. Attorney's Office access to any requested financial

12   information to include submitting to periodic debtor's exams as

13   directed by probation.

14         You shall submit your person, residence, place of

04:19PM 15   employment or vehicle to a search conducted by U.S. Probation

16   at a reasonable time and in a reasonable manner based upon

17   reasonable suspicion of contraband or evidence of a violation

18   of a condition of supervision.  Failure to submit to a search

19   may be grounds for revocation, and you shall warn any resident

04:19PM 20   present at your premises where you're living that the premises

21   may be subject to a search pursuant to this condition.

22         And finally, you shall submit to removal proceedings,

23   including deportation exclusion as required by the Department

24   of Homeland Security; and you shall not re-enter the United

04:19PM 25   States without proper authorization.

1          Does either counsel have any reason to put on the

2    record as to why sentence should not be imposed as stated?

3          MR. BRADY:  No, Your Honor.

4          MR. ELDEN:  No, Your Honor.  I do have several

04:19PM 5    requests, though, if I could.

6          THE COURT:  Yes.  All right.

7          MR. ELDEN:  First, could the court recommend --

8          THE COURT:  All right?  Well, let -- before we get

9    there, let me take care of some other matters.  There are no

04:20PM 10   counts to dismiss; is that right?

11         MR. BRADY:  That's correct.

12         THE COURT:  Let me tell your client his appellate

13   rights, and then we'll get to --

14         MR. ELDEN:  That's fine.

04:20PM 15         THE COURT:  Mr. Cacho, I do want to inform you of what

16   your rights are regarding taking an appeal from the judgment

17   and sentence in this case.

18         In order to appeal, you must file a notice of appeal

19   within ten days of entry of judgment.  Failure to do so within

04:20PM 20   that ten-day period normally acts as a waiver, meaning you

21   would give up your right to appeal.  So, you must do so within

22   that ten-day window.

23         You also have a right to assistance of counsel in

24   pursuing an appeal.  And if you cannot afford counsel to bring

04:20PM 25   an appeal on your behalf, then one may be appointed for you --

1      or will be appointed for you free of charge.  The government

2      also has a right to appeal the sentence I imposed.

3              Do you understand those rights?

4              THE DEFENDANT:  (In English)  Yes, I understand.

04:20PM  5      THE COURT:  All right.

6              Okay.  Some recommendations then?

7              MR. ELDEN:  Yes, Your Honor.  Could -- I would ask the

8      court to recommend that he be housed in Southern California --

9      in the Southern California area.  Taft would probably be the

04:21PM  10     appropriate level but, if not Taft, at Lompoc.

11             THE COURT:  All right.  Do you want me to make

12     specific recommendations or just say Southern California?  I'm

13     open to either -- either way.

14             MR. ELDEN:  Why don't we make a recommendation for

04:21PM  15     Taft?

16             THE COURT:  Taft is No. 1 and Lompoc is No. 2?

17             MR. ELDEN:  Yes.  Second, Your Honor, as to the fine,

18     could that be directed to be paid at -- in an amount to be

19     determined by the probation -- or the supervised release

04:21PM  20     officer?

21             THE COURT:  Yeah, there should have been a provision

22     on that.  And can I waive interest until he gets out of

23     custody?

24             PROBATION OFFICER:  Yes, Your Honor.

04:21PM  25     THE COURT:  All right.

39

            1           PROBATION OFFICER:  And it generally is at least 10
            2   percent of the defendant's gross income per month minimum.
            3           MR. ELDEN:  That's after he gets out?
            4           PROBATION OFFICER:  Yes.
04:22PM     5           THE COURT:  Okay.  So, what I'm going to do to make it
            6   clear then is as to the fine, the interest will be waived while
            7   you're in custody, Mr. Cacho.  So, interest won't be running
            8   while you're in custody.  Once you're out of custody and on
            9   supervision, interest will begin to accrue at that point in
04:22PM    10   time.  Do you understand that?
           11           THE DEFENDANT:  (In English)  I understand.
           12           THE COURT:  All right.  After you're released from
           13   prison, you shall pay the fine based on installments agreed --
           14   I'm sorry -- instructed to you by probation but in an amount
04:22PM    15   not less than 10 percent of your monthly gross income.  Do you
           16   understand that?
           17           THE DEFENDANT:  I understand.
           18           THE COURT:  All right.  Does that take care of that?
           19           MR. ELDEN:  I think that that does, Your Honor.  I
04:22PM    20   think we need a minute order just to reflect that, but that
           21   will be fine.
           22           THE COURT:  All right.  That will be included as a
           23   condition of supervision.  We'll add that as a condition of
           24   supervision.  All right?
04:22PM    25           Any other recommendations then, Mr. Elden?

1          MR. ELDEN:  I -- I don't know if the --

2          THE COURT:  -- I can recommend --

3          MR. ELDEN:  -- the BOP -- minimum security -- of

4     course, I would recommend minimum security, but he's not an

04:23PM  5     American citizen.  So, I don't think he qualifies for the DAP

6     program.

7          THE COURT:  Well, you know what I've heard -- and, of

8     course, he wouldn't answer the question -- or you wouldn't

9     answer the question for him on his behalf.  What I've been told

04:23PM 10     from some other defense counsel is that the Bureau of Prisons

11     is opening up that program to more individuals.  Although, they

12     don't get the credit for it.  I don't know how accurate that

13     is, but that's what I have been told.

14          Now, I certainly can simply recommend drug treatment

04:23PM 15     if he believes it's appropriate.

16          MR. ELDEN:  I believe it would be appropriate, Your

17     Honor.  I would ask to make that recommendation and --

18          THE COURT:  All right.

19          MR. ELDEN:  -- It sure wouldn't hurt.

04:23PM 20          THE COURT:  What I'm going to is simply recommend drug

21     treatment and let the Bureau of Prisons decide, after

22     consultation, what to do.  I'll also recommend some educational

23     opportunities.  I don't think he needs vocational training

24     because he has a skill that seems pretty firm; but I think

04:23PM 25     educational opportunities, if available to him, will -- would

1   be useful.

2               MR. ELDEN:  That would be fine, Your Honor.

3               THE COURT:  All right.  Anything further then?

4               MR. BRADY:  No, Your Honor.

04:24PM  5      THE COURT:  No?

6               MR. ELDEN:  That's it.

7               THE COURT:  All right.  Thank you.  We're in recess.

8               MR. ELDEN:  Thank you very much, Your Honor.

9               (Proceedings concluded at 4:24 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I, Sharon Ross, Official Court Reporter, United

3     States District Court, District of Hawaii, do hereby certify

4     that the foregoing is a correct transcript from the record of

5     proceedings in the above-entitled matter.

6          DATED at Honolulu, Hawaii, October 23, 2007.

7

8                              /s/Sharon Ross  *Sharon Ross*

9                              SHARON ROSS

10                             CSR 432, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25