1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3
     UNITED STATES OF AMERICA,     ) CRIMINAL NO. 05-00164 JMS
4                                  )
              Plaintiff,           ) Honolulu, Hawaii
5                                  )
          vs.                      ) May 5, 2008
6                                  )
     JESUS CACHO,                  ) 9:15 a.m.
7                                  )
              Defendant.           ) Evidentiary Hearing re:
8                                  ) Motion to Vacate Under
                                   ) 28 U.S.C. Section 2255
9                                  )
     _____)
10                  PARTIAL TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE J. MICHAEL SEABRIGHT,
                  UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
       For the Government:       THOMAS MUEHLECK
14                               Assistant U.S. Attorney
                                 District of Hawaii
15                               Room 6100 - PJKK Federal Bldg.
                                 300 Ala Moana Blvd.
16                               Honolulu, Hawaii 96850

17     For the Defendant:        JEFFREY ARAKAKI
                                 1188 Bishop Street, Ste. 1604
18                               Honolulu, Hawaii 96813

19

20     Official Court            GLORIA T. BEDIAMOL, RPR, RMR
       Reporter:                 United States District Court
21                               P.O. Box 50131
                                 Honolulu, hawaii 96850
22

23   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
24

25

1

2                          I N D E X

3    WITNESSES:                                    PAGE NO.

4
     JESUS CACHO
5        DIRECT EXAMINATION BY MR. ARAKAKI              6
         CROSS-EXAMINATION BY MR. MUEHLECK             20
6        REDIRECT EXAMINATION BY MR. ARAKAKI           35
         RECROSS-EXAMINATION BY MR. MUEHLECK           40
7        REDIRECT EXAMINATION BY MR. ARAKAKI           43

8

9

10   EXHIBITS:                                     PAGE NO.

11     Government's Exhibit 1 was received in evidence    24

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Monday, May 5, 2008                        9:15 a.m.
 2           THE CLERK:  Criminal number 05-00164 JMS United States
 3   of America versus Jesus Cacho.  This case is called for an
 4   evidentiary hearing regarding a motion to vacate under 28
 5   U.S.C. Section 2255.
 6           MR. MUEHLECK:  Tom Muehleck for the United States.
 7   Good morning, Your Honor.
 8           THE COURT:  Yes, good morning.
 9           MR. ARAKAKI:  Good morning, Your Honor, Jeff Arakaki
10   on behalf of Jesus Cacho.  Also present is Miguel Saibene a
11   Spanish interpreter.  I believe Mr. Saibene needs to be
12   qualified prior to our continued --
13           THE COURT:  Have you been sworn in this case,
14   Mr. Saibene?
15           THE INTERPRETER:  Yes, Your Honor, two years ago.
16           THE COURT:  All right.  So he's already been appointed
17   in this case and sworn previously.
18           MR. ARAKAKI:  Thank you, Your Honor.
19           MR. MUEHLECK:  Mr. William Domingo is also present,
20   Your Honor.  Does counsel waive his presence or will counsel
21   object to that or have no objection to that, since he may be a
22   government witness?
23           MR. ARAKAKI:  Your Honor, I have no problems with
24   Mr. Domingo being here.
25           THE COURT:  And staying in the room?
```

 1          MR. ARAKAKI:  And staying in the room.

 2          THE COURT:  All right.  Very well.  You may be seated.

 3   Thank you.

 4          Although, Mr. Arakaki, I do want to have Mr. Cacho --

 5          Mr. Saibene, please be seated.

 6          Mr. Arakaki, you were appointed after I determined an

 7   evidentiary hearing would have to be held in this case as the

 8   2255 rules required.  What I did want to ask you is if you have

 9   gone through the pro se pleading by your client to determine

10   which issues you want to go forward on here today.

11          MR. ARAKAKI:  Your Honor, I went through all of this,

12   I discussed this matter with my client.  The supplement --

13   first supplement to the traverse of the government's response,

14   which I prepared and which Mr. Muehleck has a copy of as well

15   as the judge, outlines, as best as I can, my client's position

16   and situation regarding this matter.

17          There are also issues relative to whether or not he

18   was induced by Mr. Mr. Elden into pleading as well as some

19   questions regarding change of venue.  I've had some discussion

20   about that with him as well.  I will perhaps -- I did tell them

21   that if he wanted to let Your Honor know what his thoughts were

22   about that, that he might express that to Your Honor.  But I

23   did let him know that, from what I gathered in my discussion

24   with him, what I have in my supplement is the gist of our

25   position and argument.

1          THE COURT:  Well, that doesn't help me much.  In other

2     words, he set forth a lot of issues.  I needed to know whether

3     I need to address each and every one of those or not. And if

4     you're telling me I have to address all of them, then that's

5     fine.  I just want to know, because it's more common than not

6     that once counsel is appointed the issues become somewhat more

7     focused and narrow.

8          MR. ARAKAKI:  Your Honor, again, when we speak of the

9     issues, I think that I've covered most of it.

10          THE COURT:  Well, what I'm getting at, Mr. Arakaki,

11     the venue issue, is it still on the table or not?

12          MR. ARAKAKI:  I think my client would like to address

13     that.  I have discussed that venue issue with him and let him

14     know what the situation is and tried to explain to him the

15     venue matter.  But perhaps he would like to expound on that so

16     I will allow him to do that.

17          THE COURT:  So it's still on the table, is that what

18     you are telling me?

19          MR. ARAKAKI:  Yes.

20          THE COURT:  That's all I'm asking.  I'm not asking for

21     anything more.  Are you prepared to present your evidence this

22     morning?

23          MR. ARAKAKI:  We are, Your Honor.

24          THE COURT:  All right.

25          MR. ARAKAKI:  At this time, I would like to call

1    Mr. Cacho to the stand.

2                    JESUS CACHO, DEFENDANT, WAS SWORN.

3                    THE COURT:  Mr. Cacho, take the witness stand.

4                    THE CLERK:  Please state your name and spell your last

5    name.

6                    THE WITNESS:  Jesus Cacho, C-A-C-H-O.

7                    MR. ARAKAKI:  Your Honor, Mr. Cacho will be expressing

8    himself in English.  Over the past couple of years he has been

9    working hard at his English.  And if there's a problem relative

10   to his English, then Mr. Saibene would assist.  I think that's

11   how we will proceed.

12                   THE COURT:  All right.

13                        <u>DIRECT EXAMINATION</u>

14   BY MR. ARAKAKI:

15   Q    Mr. Cacho, what was your decision to file the 2255

16   petition?  What made you decide to file this petition?

17   A    Because I lost already the right to the direct appeal, the

18   10 days.  And I was calling Mr. Elden's office at least once a

19   month.  I wrote him several letters; he never answered.  And

20   then the time was expiring to fill out the 2255, which was the

21   only remedy available for a federal prisoner.  So I don't want

22   to lose that opportunity too.  I resolve to fill out the 2255

23   for myself.

24   Q    Did Mr. Eldon, before your sentencing, let you know what

25   the consequences of your sentencing would be?

```
 1   A    Not that I recall.
 2   Q    Well, let me ask you this:  Were there any promises that
 3   were made to you, or did you have any expectations regarding
 4   what would happen with your sentencing and after your
 5   sentencing?
 6        MR. MUEHLECK:  Objection to leading questions.
 7        MR. ARAKAKI:  Your Honor, I think that it's difficult
 8   for me to --
 9        THE COURT:  Overruled.
10        MR. ARAKAKI:  Thank you.
11   BY MR. ARAKAKI:
12   Q    Again, did you have any expectations regarding what would
13   happen at sentencing and after sentencing?
14   A    Yeah, I was expecting the issue of cooperation with the
15   government.  That was what Mr. Eldon was talking to me from the
16   beginning.
17   Q    Okay.  You did read the letter that Mr. Muehleck had sent
18   to Mr. Elden about that matter regarding cooperation, did you
19   not?
20   A    Yes, I read the letter.
21   Q    You also know that Mr. Elden sent a letter back to
22   Mr. Muehleck about that?
23   A    Yes.
24   Q    But it's my understanding that you did not -- pardon me,
25   that you did expect to continue to cooperate with the
```

1  government; is that correct?

2  A    Yes, because the same day I was sentenced, the moment I

3  had my debriefing, the agent told me we can see the issue of

4  cooperation later on.

5  Q    Did -- after your sentencing before Judge Seabright on

6  August 7, 2006, did Mr. Domingo and Mr. Elden ask you whether

7  or not you wanted to appeal the sentencing in your case?

8  A    Not that I recall.

9  Q    Which means to say they may have, but you don't recall

10 that?

11 A    That could be, but exactly I cannot remember that.

12 Q    In any event --

13         THE COURT:  Let me ask, you said it could be but you

14 can't remember that?

15         THE WITNESS: I cannot remember that exactly.

16         THE COURT:  Are you saying it didn't happen, or you

17 don't remember it happening?

18         THE WITNESS:  Well, in fact, I was over there calling

19 my lawyer and writing to my lawyer.  My lawyer never got to see

20 me.  The only thing I can remember at the time of sentencing I

21 was moving so quickly over there and my lawyer told me, "I will

22 come back."  And I never seen my lawyer anymore.  That was the

23 last time I saw my lawyer.

24 Q    What you're saying is that Mr. Elden promised to come back

25 to see you after your sentencing; is that correct?

1   A    Yes, he promised me.

2   Q    Have you seen or met with Mr. Elden since August 7, 2006?

3   A    Exactly.

4   Q    Have you seen --

5   A    No, I never seen Mr. Elden from August 7, 2006.  The only

6   lawyer I saw from August 7, 2006 was you.

7   Q    And so at what point did you decide then that you wanted

8   to appeal your case?

9   A    Because after I was there in prison in the mainland, the

10  time was expired to me from the one-year limitation, so I need

11  to do something for myself.  Because if I keep waiting for my

12  lawyer, my lawyer never got to see me.

13  Q    Okay.

14  A    So I decided to fill out the 2255.

15  Q    I understand about the 2255, but what about the appeal

16  regarding your case?  When did you decide you wanted to appeal

17  your case?  And why did you decide you wanted to appeal the

18  sentencing?

19  A    I decided to appeal because for me it's not very clear in

20  Hawaii because I -- in San Diego, California; that's why.

21  Q    Do you recall when you contacted your -- about when you

22  contacted your wife?

23  A    I contact my wife -- well, as a matter of fact, I tried to

24  call my wife every day.

25  Q    From the time that you were sentenced?

 1  A    At the time I was sentenced, I called my wife and before

 2  three days, two days, and my lawyer never come to see me.  So I

 3  say, Well, I need to appeal this.

 4  Q    Okay.  And what did you tell your wife to do?

 5  A    Tell to Mr. Elden to fill out a notice of appeal for me.

 6  Q    When Mr. Elden did not file that notice of appeal and he

 7  did not answer your letters and phone calls, what then did you

 8  do?

 9  A    I fill it out the 2255 and sent it to this court, after

10  Mr. Elden never answered my phone calls and never answered my

11  letters.

12  Q    Okay.

13  A    So at the same time I fill out the 2255, I filled out an

14  extension of time of 60 days in order that I can have my

15  records, because I have no records with me.

16  Q    What did you want to talk to Mr. Elden about?

17  A    About the cooperation issue.

18  Q    About the what issue?

19  A    Cooperation issue.

20  Q    What did Mr. Elden tell you about that cooperation issue?

21  A    The last time when I saw Mr. Elden, he told me, "We will

22  come back.  We will work something about it."

23  Q    Okay.

24  A    We can solve the situation from California.

25  Q    Since then, you've done a lot of homework regarding this

1  matter of cooperation.  Can you tell me what you've learned in

2  your homework regarding this cooperation issue now?

3          MR. MUEHLECK:  Well, I'm going to object.  Cooperation

4  is not on the table on a 2255.  There's no issue that's before

5  the court in the 2255 that says he was denied the right to

6  cooperation.  We're going off on matters that are not in the

7  2255 petition.

8          THE COURT:  Mr. Arakaki.

9          MR. ARAKAKI:  Your Honor, again, when I was appointed

10  on this case, there were certain questions I asked my client.

11  In particular, why did he file this particular petition?  And I

12  discussed all the other issues in this matter, but ultimately

13  this is his response to me as far as why he filed the

14  particular petition.

15          THE COURT:  But it's not part of the petition itself.

16  Nothing about cooperation is in the petition itself; isn't that

17  right?

18          MR. ARAKAKI:  Well, the issue about Mr. Elden not

19  responding to his contacts is.  And I think that's relative to

20  his letters and contacts.  And I think it's --

21          THE COURT:  Pull out the 2255 and show me where I can

22  reasonably infer that there's an issue before me regarding

23  cooperation.

24          MR. ARAKAKI:  I don't know if it's a matter -- well --

25  I think that ground one conviction obtained by plea of guilty

1    which was unlawfully induced and without understanding the

2    consequences of the plea.  This was a question that -- the

3    following statement, I was not given the opportunity to clearly

4    understand the consequences and effects of the maximum

5    penalties including the special terms of restitution payment.

6        But when asked -- when I asked him about this

7    inducement, as well as understanding his plea, his response was

8    again that Mr. Elden did not respond to his letters and to his

9    calls.

10        THE COURT:  I don't see how the government can be on

11    notice at this point, Mr. Arakaki; that there's any challenge

12    regarding cooperation in this 2255.  Because underneath there

13    where it says "supporting facts," it talks about the effects of

14    the maximum penalties and including the special term of

15    restitution payments.  I just don't see how the government can

16    be on notice at this point that this 2255 includes anything

17    dealing with cooperation.  I certainly didn't read it that way.

18        MR. MUEHLECK:  For the record, the first time I seen

19    anything about cooperation in this case was that was filed this

20    morning at 8:49.

21        THE COURT:  Me too.

22        MR. MUEHLECK:  Right.  He keeps expanding the record

23    here, expanding the issues here, which we object.

24        MR. ARAKAKI:  Again, also, he has made it clear he

25    believes his counsel was ineffective in this matter.

1          THE COURT:  Well, that doesn't quite --

2          MR. ARAKAKI:  I understand.

3          THE COURT:  -- provide much limitation.

4          MR. ARAKAKI:  There's nothing that clearly points to

5     the cooperation, but this is something that arose in my

6     discussions with him as to the ineffectiveness of counsel as to

7     why.

8          THE COURT:  The objection is sustained.

9     BY MR. ARAKAKI:

10    Q    In your letters and communication with Mr. Elden, what did

11    you express?  When you called him or wrote letters to

12    Mr. Elden, what were the contents of those letters?

13    A    I expect that I still waiting for him to visit me.  He

14    promised to me.  And I also expressed to him, to his office,

15    that I expecting -- they start to -- tried to protect Alejandro

16    Gonzalez Guerrero who I've never seen in my life.  But I feel

17    in some part I feel the court is protecting Alejandro Gonzalez

18    Guerrero, because for me it's so hard to try to realize who is

19    the responsible for distributing over 300 pounds of

20    methamphetamine to the island of Maui how it says in the PSR.

21    And now they seem to say, I don't care.  I don't interest him

22    anymore.

23    Q    Some of your concerns were regarding the issue of the

24    venue, regarding the fact that Mr. Elden did not file a motion

25    to change the venue from Hawaii to -- is that correct?

1  A     I told to Mr. Elden from the very beginning that I never

2  seen Mr. Alejandro Gonzalez Guerrero in my life.  I never know

3  him.  So I don't know how I can conspire with a man who I never

4  seen in my life.  Also, if I deliver one box over there in

5  California, postal box, will come here to Hawaii.

6  Q     How did he respond to that?

7  A     He just --

8  Q     Did he respond at all?

9  A     He just told me that we can fix everything about the

10  cooperation later on.

11  Q     On the morning of your sentencing, was there in fact a

12  debriefing that happened?

13         MR. MUEHLECK:  Objection as to relevance.

14         MR. ARAKAKI:  Your Honor, he was sentenced on August

15  7, 2006.  There was a debriefing that apparently occurred just

16  prior to sentencing.  I believe that it goes to his

17  understanding of the consequences of his plea.  One of the

18  things that he is saying is that I did not understand the

19  consequences of my plea.

20         MR. MUEHLECK:  Withdraw the objection.

21         THE COURT:  All right.

22  BY MR. ARAKAKI:

23  Q     Again, was there in fact a debriefing which occurred on

24  the morning of your sentencing?

25  A     At the morning of the 7th, I was talking with the agent of

1    the case about not participation in this case.  And he told me

2    we can see the cooperation in the future.

3    Q    Who was at that particular debriefing?

4    A    That was the agent of the case, another agent from the

5    FBI, Mr. Elden, and Ms. Lilia Felix.

6    Q    Who encouraged or who set up that particular debriefing

7    for you?

8    A    I misunderstand -- Mr. Elden prepared the --

9    Q    What did he tell you the debriefing was for?

10   A    While looking for the cooperation.  He told me that.

11   Q    And that is why that debriefing was -- you had that

12   debriefing?

13   A    Yes.

14   Q    So when you went to your sentencing, were you clear about

15   the consequences of your plea?

16   A    Not at all.

17   Q    Okay.  And, in fact, is this why you tried to contact or

18   have contact with Mr. Elden?

19   A    Yeah, I tried.

20   Q    And he never saw you after sentencing?

21   A    No.

22         MR. ARAKAKI:  Your Honor, I would like to ask this

23   court whether or not I might go into an area that apparently is

24   vague, and I know that the court says that it could not find in

25   its perusal of the petition any inference or a reasonable

1    inference to cooperation.  But I would like to ask my client as

2    to whether or not he has information about Alejandro Gonzalez

3    Guerrero his co-defendant.

4              THE COURT:  His co-defendant?

5              MR. ARAKAKI:  Yes.

6              MR. MUEHLECK:  We have no objection for him going into

7    something, Judge, but we do have an objection, if we're going

8    to raise this now as failure to seek cooperation -- or Rule 35

9    reduction is ineffective assistance of counsel.  We have no

10   problems with asking questions.  It may be the argument that

11   will be made by Mr. Arakaki that I would object to.

12             THE COURT:  In other words, to the extent this

13   evidence could tie into the issues that were actually raised,

14   you don't object.  You object to it as a stand-alone issue?

15             MR. MUEHLECK:  Yes.  Yes.

16             THE COURT:  Mr. Arakaki, go ahead and ask your

17   questions.

18             MR. ARAKAKI:  Thank you, Your Honor.

19   BY MR. ARAKAKI:

20   Q    Mr. Cacho, do you have information about the whereabouts

21   of your co-defendant Alejandro Gonzalez Guerrero?

22   A    I have the information and also I think the agent has the

23   information too.  Because I gave him the information the same

24   day of my sentencing in the morning time. I gave him pictures

25   where Alejandro lives, about the cars he drives over there in

 1    Mexico.

 2            MR. ARAKAKI:  Your Honor, I would pass the witness at

 3    this time.

 4            THE COURT:  All right.  Mr. Muehleck.

 5            MR. MUEHLECK:  May I have a brief recess?  I sent my

 6    paralegal to get a document.  This traverse was filed this

 7    morning.  He has gone into this, and I would like to look at a

 8    couple of things before we go ahead.

 9            THE COURT:  Yes.  Let's just take up another issue

10    while we're waiting, Mr. Muehleck.  As I understand it,

11    Mrs. Cacho could not be brought into court through the video

12    conferencing today.  So what do you propose to do about that?

13    Just come back, Mr. Arakaki, and try to do it later in the

14    week?

15            I talked to Mr. Afuso, and he seemed to be somewhat at

16    a loss as to where the problem is, whether it's on our side or

17    their side.

18            MR. ARAKAKI:  I can tell you that it was just very

19    difficult to get the time and try to work this out.  I have no

20    problems in coming back, but I also know that this particular

21    issue regarding -- well, I think it's an important issue.  I

22    think we should try.  I think we should try to come back and

23    see whether or not she would be available.  I was looking

24    through her notes and what she sent me, as far as the telephone

25    contacts she had, the register of phone calls and everything

1    else, and I think there's more that she -- she just looked at

2    the period just at sentencing.

3            THE COURT:  I mean, let me be clear.  This tends to be

4    a dispute that I need to make a credibility determination on.

5    She says she called and said I want to file a notice of appeal.

6            MR. ARAKAKI:  Then we should definitely have her.

7            THE COURT:  I can't in the abstract decide this issue.

8    As a matter of fact, I an evidentiary hearing on this issue

9    alone; now, you're expanding this.  The only reason I appointed

10   you and agreed to an evidentiary hearing is because if what

11   Mr. Cacho says is true, he wins on this appeal issue.  And I

12   would vacate judgment and reenter judgment, and the 10-day

13   clock would run anew.

14           On the other hand, if what Mr. Muehleck says, that is

15   Mr. Domingo and Mr. Elden and the secretary say is true, and

16   what Mr. Cacho says is not true, he loses.  They had a

17   discussion, and he determined not to file a notice of appeal

18   and made that clear to his counsel.

19           And so to me it's a very simple I have to make a

20   credibility determination, unless the evidence comes out

21   differently.  That's why I appointed you; that's why we're

22   having this hearing.

23           MR. ARAKAKI:  And that's why we tried to set that

24   thing for this morning, Your Honor.

25           THE COURT:  Well, what I see you doing, no, is trying

1    to make this into something different now.

2         MR. ARAKAKI:  Well, Your Honor, I did not have all --

3    I met with my client over the past week a number of times to

4    try to find out exactly what's happening in this case and what

5    he wants, what the petition is all about.  And so I made these

6    inquiries as to why the petition was prepared, why he did what

7    he did, and I just wanted to let the court and Mr. Muehleck

8    know where he is at regarding this matter.

9         THE COURT:  All right.  I don't have any problem with

10   you letting me know that.  But the problem is expanding these

11   issues beyond what is in the 2255 and beyond what I've

12   permitted the evidentiary hearing for.

13        MR. ARAKAKI:  With that having been -- I have been --

14   with that, Your Honor, then we will have her later this week, I

15   think.

16        THE COURT:  Schedule-wise, do you know when you'll be

17   available, Mr. Muehleck?

18        MR. MUEHLECK:  No, I don't.  I didn't bring my

19   calendar, I'm sorry. Your Honor.

20        THE COURT:  You two want to talk after this hearing

21   and maybe talk to Mrs. Cacho and the marshal service in San

22   Diego and try to set something up for Thursday or Friday?

23        MR. ARAKAKI:  I think that it's really dependent upon

24   the marshal services in San Diego.  But Mr. Afuso indicated to

25   me that maybe we should try some place other than the marshall

 1   service because he can't figure out why there's this glitch.

 2          THE COURT:  I know you can go to like a Mail Boxes,

 3   Etc. or one of those type of places.  Some of them have that

 4   service.  Now, obviously, you would have to pay for it.  But

 5   some of them have that service where they can hook up for video

 6   conferencing as well.

 7          So you're going to have to talk to her ASAP and try to

 8   figure that out and work with Mr. Muehleck to get a date this

 9   week if possible.

10          MR. ARAKAKI:  Okay.

11          THE COURT:  Mr. Muehleck, are you ready now, or do you

12   need a break?

13          MR. MUEHLECK:  I do need a break.  Just five minutes

14   or something, Judge, please.

15          THE COURT:  Yes, we'll take five minutes.

16   (Recess at 9:46 a.m. until 9:54 a.m.)

17          THE COURT:  Back on the record with counsel and

18   Mr. Cacho.  I remind you you are still under oath.

19          MR. MUEHLECK:  May I from here, Your Honor?

20          THE COURT:  You may.

21          MR. MUEHLECK:  Thank you, Your Honor.

22                         CROSS-EXAMINATION

23   BY MR. MUEHLECK:

24   Q    Mr. Cacho, you filed this 2255 in this case?

25   A    Yes, I did.

1   Q    You signed it?

2   A    I signed it.

3   Q    Okay.  On July 19, 2007?

4   A    Yes, I remember that.

5   Q    In that 2255, you declared that everything you said was

6   under -- was truthful under penalty of perjury; correct?

7   A    Correct.

8   Q    And in that 2255, you said that no Miranda rights were

9   lawfully executed -- as ground two for your appeal or your 2255

10  you said that no Miranda rights were lawfully executed?

11  A    Can you say that again, please?

12  Q    Under ground two of your 2255 petition, did you say that

13  no Miranda rights were lawfully executed at the time of your

14  arrest?

15  A    Yes, I did that.

16  Q    In fact, you did receive Miranda rights at the time of

17  your arrest?

18  A    No, sir, I never received in fact.

19  Q    Nobody gave you Miranda rights?

20  A    Nobody told me nothing.  I just was sitting over there in

21  one office, and they start to ask me some questions, but they

22  never told me nothing about the Miranda rights.

23  Q    Nobody gave you Miranda rights in Spanish?

24  A    Nobody gave me the Miranda rights in Spanish.  We are

25  talking in English.  How would they give me the Miranda rights

1   in Spanish?

2   Q    I'm sorry, what was your answer?

3   A    We were talking English over there.

4   Q    Didn't they give you a Spanish language Miranda rights?

5   A    Nobody told me nothing in Spanish over there.

6   Q    Where were you --

7   A    Nobody spoke Spanish over there.  I think I was the only

8   one person who spoke Spanish.

9   Q    How long have you spoke English?

10  A    I improve my English in prison, Mr. Muehleck.

11          MR. MUEHLECK:  Exhibit 1 to Mr. Arakaki for his

12  inspection, for the court, to the witness please.

13  BY MR. MUEHLECK:

14  Q    Do you recognize that?

15  A    Yes, I recognize that.

16  Q    That's a Spanish advisement of Miranda rights, isn't it?

17  A    It does.  Somebody told me the Miranda rights or doesn't

18  it say read this before.

19  Q    Is that your signature?

20  A    That's my signature.

21  Q    Did you read that before you signed it?

22  A    No.

23  Q    Didn't you read that in Spanish, or didn't you read that

24  to yourself and explain what that was in English to the FBI

25  agent, Agent Roudow?

1    A    What I told you is I never read what I signed at that
2    time.  I just was arrested.
3    Q    Didn't you read that out loud to Agent Roudow and explain
4    to him in English what was on that document?
5    A    No, I never did that.
6    Q    What is that document?
7    A    Pardon me?
8    Q    What is that?
9    A    It says notificating (sic) me my rights.
10   Q    What is it?
11   A    Notification of rights.
12   Q    It's in Spanish.  Notification of Rights; correct?
13   A    Yes, it's in Spanish.
14   Q    Does it say in there you have a right to talk to an
15   attorney?
16   A    Yes, it says.
17   Q    Does it say in there you have the right to remain silent?
18   A    Yes, it says.
19   Q    And it's your signature at the bottom; correct?
20   A    Correct.
21   Q    And it says you give up those rights?
22   A    Yes, it say.
23   Q    And it's your testimony today that you never read that
24   document?
25   A    Yes, that's exactly my testimony.  I never read this

1   document.  I only signed it.

2   Q    You signed it without reading it?

3   A    I signed it without reading it.

4   Q    Retrieve the exhibit --

5           THE COURT:  Yes.

6           MR. MUEHLECK:  No, offer the exhibit.

7           THE COURT:  Any objection?

8           MR. ARAKAKI:  No objection, Your Honor.

9           THE COURT:  Exhibit 1 is admitted.

10          (Government's Exhibit 1 was received in evidence.)

11  BY MR. MUEHLECK:

12  Q    This is Mr. Domingo your attorney?

13  A    Yes, sir.

14  Q    And he talked to you after you were sentenced on August 7?

15  A    I don't recall that.

16  Q    You don't recall that?

17  A    I don't recall that.

18  Q    Did Mr. Elden talk to you on August 7 after your

19  sentencing?

20  A    Not that I recall.

21  Q    Didn't Mr. Domingo tell you about your appellate rights,

22  the right to file a notice of appeal and appeal your sentence

23  that you just received?

24  A    I just cannot remember that, Mr. --

25  Q    Didn't Mr. Elden, after your sentencing, tell you you had

1   the right to file an appeal?

2   A    I remember the judge told me that in court.  I had the

3   right to fill out an appeal, and I had 10 days to fill out the

4   appeal.

5   Q    And didn't Mr. Elden tell you that also after your

6   sentencing?

7   A    I not recall that.

8   Q    Didn't you tell Mr. Domingo that you weren't interested in

9   appealing your sentencing; that you were satisfied with the

10  sentence?

11  A    I don't recall that.

12  Q    Didn't you tell Mr. Elden that you had no interest in

13  filing an appeal?

14  A    I don't recall that.

15  Q    Now, your testimony today is that you contacted your wife

16  and told her to file notice of appeal?

17  A    Yes.

18  Q    When was that?

19  A    Pardon me?

20  Q    When did you contact your wife and tell her?

21  A    I called my wife every day.

22  Q    From where?

23  A    When I came from prison, sir.  I'm a prisoner.

24  Q    Where were you held after your sentencing, at the FDC in

25  Honolulu?

1   A    Yes, sir.

2   Q    How long were you held there?

3   A    I was over there like almost one month after my

4   sentencing.

5   Q    And isn't it after you were moved to the mainland that you

6   determined that you wanted to file an appeal?

7   A    The 2255.

8   Q    When did you decide you wanted to file a notice of appeal

9   of your sentence?

10  A    I decide to fill out a notice of appeal of my sentence

11  three or four days after my sentence.

12  Q    Three or four days?

13  A    Yeah, because I was calling my office lawyer.  I was

14  expecting to see my lawyer again.  That never happened.

15  Q    Okay.  So if you were sentenced --

16  A    So also I decide to fill out the notice of appeal of my

17  sentence because I feel so weak the proposal of the government

18  about the cooperation.  Also, I read your letter --

19       THE COURT:  Mr. Muehleck, this discussion about

20  letters, I don't have those with me.

21       Mr. Arakaki, are those something that you folks have

22  we can enter into the record?

23       MR. ARAKAKI:  Your Honor, it's in a group of documents

24  headed notice of submission of document under seal filed on

25  February 1, 2008.  This was given to me as part of the packet

1    from Mr. --

2              THE COURT:  Part of the government's response?

3              MR. ARAKAKI:  I believe it is.

4              THE COURT:  The supporting documents.

5              THE WITNESS:  Your Honor --

6              MR. MUEHLECK:  I don't understand what he is referring

7    to, Your Honor.

8              THE COURT:  Well, there's a reference in Mr. Arakaki's

9    direct, and I thought that's what he was just referring to,

10   Mr. Muehleck.  I might be mistaken about a letter from you and

11   a letter from Mr. Elden regarding cooperation.

12             MR. MUEHLECK:  All right.

13             THE COURT:  I'm just trying to figure out where those

14   are is all.

15             MR. MUEHLECK:  I would like to hear the defendant's

16   response if he can tell us what about this letter.

17             THE COURT:  I would like to see the letter is all I'm

18   saying.  I am familiar with those letters.  I just didn't know

19   what was being referred to.  Thank you.

20             All right, Mr. Muehleck.

21   BY MR. MUEHLECK:

22   Q    So it was about three or four days after your sentencing

23   you decided to appeal?

24   A    Yes, sir.

25   Q    That would have been about August 10 or August 11?

```
 1   A    Yeah.

 2   Q    And that was when you contacted your wife and asked her to

 3   call Mr. Elden and get him to appeal?

 4   A    Yes.

 5   Q    And you had called from the prison, the FDC in Honolulu?

 6   A    Yes.

 7   Q    Now, you understood at the time you pled guilty about the

 8   maximum sentence, correct?

 9   A    No.

10   Q    Didn't the judge ask you if you understood what the

11   maximum sentence would be?

12   A    Yes, the judge explained that to me.

13   Q    The judge did?

14   A    Yes, sir.

15   Q    And you told him that you understood the maximum sentence

16   could be up to life imprisonment, right?

17   A    Yes, sir.

18   Q    And a mandatory 10 years, correct?

19   A    Correct.

20   Q    So you did understand the maximum sentence to be life at

21   the time you pled guilty?

22   A    Yes, sir.

23   Q    And you understood that you were facing a mandatory

24   minimum sentence of 10 years at the time you pled guilty,

25   correct?
```

```
 1   A     Correct.

 2   Q     And you also understood that you could receive a large

 3   fine at the time of sentencing, correct?

 4   A     Correct.

 5   Q     In your 2255 petition, you said that you didn't clearly

 6   understand the consequences and the effects of the maximum

 7   penalties, didn't you?

 8   A     Yes, sir.

 9   Q     So your 2255 is not true, is it?

10   A     When I fill it out over there, Mr. Muehleck, is my

11   attorney never explain exactly why they need for me to plead

12   guilty.  They never explain me, Oh, this is the maximum charge

13   you are -- this is the less charge.  We're looking for that

14   day.  He only told to me about cooperation.

15   Q     Didn't the judge ask you if you had --

16   A     The judge do it at the courtroom.

17   Q     The judge did it in the courtroom?

18   A     Yes.

19   Q     And you understood what the judge was saying?

20   A     Yes.

21   Q     So at the time you changed your plea in the courtroom, you

22   understood?

23   A     What I understood at the time when I pled guilty in the

24   courtroom is that I pled guilty in order that I can take the

25   same stand right here and say when I deliver the drug, I was
```

```
 1   alone.  Not with my wife.
 2            THE COURT:  Are you saying you pled guilty so that you
 3   could testify at your wife's trial?  Is that what you're
 4   saying?
 5            THE WITNESS:  Yes, sir.
 6            THE COURT:  All right.
 7   BY MR. MUEHLECK:
 8   Q    You understood from talking to the agent, Agent Roudow, in
 9   California that the drugs were going to come to Hawaii,
10   correct?
11   A    No, sir.
12   Q    He never told you he was from Hawaii?
13   A    Maybe he told me, but not at the time when I delivered the
14   drug.  He told me maybe in a later on call.
15   Q    Didn't you know, before meeting him, that he was from
16   Hawaii?
17   A    No, sir.
18   Q    Didn't Alejandro tell you he was from Hawaii?
19   A    I don't know Alejandro.  I never seen Alejandro in my
20   life.
21   Q    How did you happen to go and deliver the drugs in
22   Oceanside to Agent Roudow?
23   A    Your agent knows that.
24   Q    Who?
25   A    Your agent, Agent Roudow, remember the same day of my
```

1     sentence I was debriefing over there --

2     Q     I'm talking about --

3     A     Not one hour.  Two hours, three or four.

4     Q     I'm talking about in Oceanside, California when you

5     delivered the drugs to the FBI, you knew he was from Hawaii,

6     didn't you?

7     A     I never deliver a drug in Oceanside, California.

8     Q     Where did you meet him? Orange County?  Where did you

9     deliver the drugs?  In Orange County, sir?

10    A     Santa Ana. In the mall.

11    Q     Santa Ana.  That's in Orange County, right?

12    A     I'm not so sure about it.

13    Q     At the mall in Santa Ana, correct?

14    A     Correct.

15    Q     And you knew at that time he was from Hawaii, correct?

16    A     No.

17    Q     You just happened to show up there?

18    A     Yes.

19    Q     Who told you to show up there?

20    A     We turn to the debrief over here, Mr. Muehleck?

21    Q     Who told you to show up there?

22          THE DEFENDANT:  Your Honor, I need to answer that?

23          THE COURT:  Yes.

24          THE WITNESS:  Because at the briefing all that's with

25    the government agent.

```
 1              THE COURT:  All last week?
 2              THE WITNESS:  When I was debriefed the same day of my
 3    sentence, I talked with the government agent all about that.
 4    All my involvement.
 5              THE COURT:  Answer Mr. Muehleck's question.
 6              THE WITNESS:  Okay.  That was Treek.
 7    BY MR. MUEHLECK:
 8    Q    Treek?
 9    A    Yes, sir.
10    Q    He told you to go there?
11    A    Yes, sir.
12    Q    He told you the guy was coming from Hawaii too, right?
13    A    No.
14    Q    Where did he tell you the guy was coming from?
15    A    He never told me nothing about it.
16    Q    Okay.  What happened to your car, your Volkswagon?
17    A    Somebody stole the car.
18    Q    Yeah.  And you were involved with attorneys to try to get
19    the claim -- the insurance claim for the car?
20    A    No, sir.
21    Q    No?
22    A    No.
23    Q    Did your wife contact Mr. Elden about getting the
24    insurance money for the car?
25    A    I don't know.  Did you remember I was over there in
```

1   prison?

2   Q     Now, who paid Mr. Elden for his services?

3   A     My family.

4   Q     Your wife?

5   A     I don't know, my family.

6   Q     Who is your family?

7   A     My family.  My mom, my brother-in-law --

8   Q     Your father?

9   A     Maybe.

10  Q     Maybe?

11  A     Maybe, I not so sure, sir.  Did you remember I was here in

12  prison?

13  Q     Weren't you in contact with your family?

14  A     Yeah, I called my family every weekend when I can.  This

15  weekend I cannot talk with my family because I'm not have

16  approve my phone numbers over here.

17  Q     Your car was stolen in March of 2006, right?

18  A     I not so sure about it, Mr. Muehleck.

19  Q     Whose name was the car registered in?

20  A     It wasn't my name.  In my wife's name.

21  Q     A moment please, Your Honor.

22  A     And it is on the records, too.

23  Q     Did you discuss with your attorney the payment for the

24  appeal?

25  A     Pardon me?

1   Q    To pay to file the appeal.

2           MR. ARAKAKI:  Your Honor, I would object.  I'm not

3   sure where we're going with these questions.

4           THE COURT:  Overruled.

5   BY MR. MUEHLECK:

6   Q    Did you discuss with your attorney payment for this

7   appeal?

8   A    No, sir.

9   Q    He was going to do this for nothing?

10  A    I don't discuss payment with my attorney because I never

11  saw my attorney after my sentence.

12  Q    Did your wife tell you that you needed money to file this

13  appeal?

14  A    No.

15  Q    Did your wife tell you that you had to pay the attorney to

16  file the appeal?

17  A    No.

18  Q    Did the attorney -- did your wife tell you that the

19  attorney wanted some money to handle the appeal?

20          MR. ARAKAKI:  Objection, Your Honor, that response

21  calls for speculation, clearly.

22          MR. MUEHLECK:  He has been in contact with his wife he

23  said about this.

24          THE COURT:  Overruled.

25  BY MR. MUEHLECK:

1    Q    Did your wife tell you you had to pay the attorney to file

2    the appeal?

3    A    No.

4    Q    When you originally hired Mr. Elden, did that fee

5    arrangement include the appeal, that he would do an appeal?

6    A    No.  I never sign a paper with Mr. Elden.

7    Q    What was the understanding you had with Mr. Elden about

8    his representation when he first started representing you?

9    A    My understanding was that he was -- he willing to fight

10   for me.

11   Q    Okay.  Did that include doing an appeal if you were

12   convicted?

13   A    That included fight for me.

14   Q    Did that include an appeal of your sentence if convicted?

15   A    Yes, sir, that include fight for me.  Everything.

16   Q    Including the appeal?

17   A    Including the appeal.

18   Q    So it was a package deal with Mr. Elden that one fee would

19   include everything, including the appeal?

20   A    Yeah.

21         MR. MUEHLECK:  A moment please.  Nothing further.

22         THE COURT:  All right.  Redirect.

23         MR. ARAKAKI:  Thank you, Your Honor.

24                    REDIRECT EXAMINATION

25   BY MR. ARAKAKI:

1    Q    Mr. Cacho, do you remember how much Mr. Elden was paid to

2    represent you?

3    A    Can you say that again, please?

4    Q    Do you know how much Mr. Elden was paid to represent you?

5    A    $60,000.

6    Q    And you also mentioned that you pled guilty because you

7    wanted to testify for your wife at trial; is that correct?

8    A    Yeah, I use one to clarify the why I was alone

9    distributing the box.

10         THE COURT:  Could you say that again?  I did not

11    understand your answer.

12         THE WITNESS:  I want to clarify that I was alone

13    distributing the box, the card box.  I was alone with nobody

14    else.

15         THE COURT:  I don't understand what that means,

16    Mr. Arakaki.

17    BY MR. ARAKAKI:

18    Q    What you're saying is that when you gave this box to the

19    undercover agent in Santa Ana?

20    A    Yes, sir.

21    Q    The Santa Ana mall you were by yourself; is that what

22    you're saying?

23    A    Yes, sir.

24    Q    So that's why you wanted to clarify that at trial?

25    A    Yes, sir.

1    Q    Okay.  Now, it was your understanding at that time that

2    the only way that you could testify on behalf of your wife was

3    if you pled guilty; is that correct?

4    A    That's what I understand.

5    Q    But that was your own understanding; isn't that correct?

6    It was not something that Mr. Elden told you or Mr. Domingo

7    told you or anything like that?

8    A    Nobody told me that.  That's what I understood at that

9    moment.

10   Q    That's what you thought?

11   A    Exactly.

12   Q    So --

13   A    That's my thought.

14   Q    When you and I talked about this issue of inducement

15   that's in your petition, you clarified why you did what you did

16   and basically you realize that you were not induced by them to

17   plead, right?

18   A    That's correct.

19   Q    That's what you told me?

20   A    That's correct.

21   Q    So although you said that in your petition, you realize

22   now that that was not an inducement on their part?

23   A    That's correct.

24   Q    You also -- we also discussed, did we not, some of the

25   materials that your wife sent me, meaning the phone register?

1    A    Yes, sir.

2    Q    And I did tell you that it seems to be incomplete, isn't

3    that correct, that the dates were only to the day after your

4    arrest -- your sentencing, and that we needed to check for more

5    of the register to see whether or not there were other calls

6    made to the Santa Monica address of Mr. Elden; isn't that

7    correct?

8    A    Yeah, that's correct.

9    Q    And that's because you had indicated that you thought that

10   you told your wife to call about three or four days after your

11   sentencing; isn't that correct?

12   A    Yeah, that's correct.

13   Q    Okay.  And that we would try to get further evidence about

14   calls made to Mr. Elden later?

15   A    That's correct.

16        THE COURT:  Mr. Arakaki, you are referring to the

17   Cingular bill you provided to the court?

18        MR. ARAKAKI:  Yes, after reviewing that -- this was

19   information that she had sent me.  That was on or about the

20   date of the sentencing.  But upon my discussions with my client

21   and everything else, I believe that there were -- we need to

22   get more information from her regarding calls.

23        THE COURT:  So, in other words, it only goes through

24   August 9th, which is only two days after sentencing, before the

25   time period he said he contacted his wife?

```
 1             MR. ARAKAKI:  August 8th or 9th.  I don't think it's
 2   complete for August 9th, Your Honor.
 3             THE COURT:  It goes through 11:30 p.m. on the 9th.
 4   Okay.
 5   BY MR. ARAKAKI:
 6   Q    Again, is it your intention to -- let me ask you this.
 7   Were you dissatisfied with the sentence that you got?
 8   A    I'm dissatisfied because my lawyer all the time was
 9   talking to me about cooperation.  He told me, "I will come back
10   to see you."  And I never seen my lawyer after my sentence.
11   Q    And you understood that the 108 months that you got was a
12   fair sentence?
13   A    Yes, I understood that.
14   Q    And that is not what you are objecting to, is it?
15   A    No, Mr. Arakaki, I'm not objecting to that.  I'm objecting
16   about --
17   Q    The promise that was made to you?
18   A    The promise for me in my opinion is, in this case, is
19   nothing but lies.  I don't know Mr. Alejandro Gonzalez
20   Guerrero.  The government say that's the monster who delivered
21   over 300 pounds to Maui but then the government says, Oh, I
22   don't care about that man.  For me, that's a big picture in
23   front of me of -- Oh, this man is a real drug dealer.
24   Q    And you have no problems in getting him, right?
25   A    Yes.
```

```
 1              MR. ARAKAKI:  No further questions in this matter,
 2   Your Honor.
 3              MR. MUEHLECK:  I do, if I might follow up.
 4              THE COURT:  You may.
 5                        RECROSS-EXAMINATION
 6   BY MR. MUEHLECK:
 7   Q    What promises were made to you?  You just talked about a
 8   promise.  What promises were made to you?
 9   A    Your agent promised me about cooperation.
10   Q    Who promised?
11   A    Your agent.
12   Q    What did he promise?
13   A    Agent Roudow, the same day when I was sentenced in the
14   morning.
15   Q    What did he promise?
16   A    He promised me that he will be -- we will see the issue of
17   cooperation later on.
18   Q    So we would look at the issue of cooperation later on?
19   A    Yeah.
20   Q    Okay.  Did he promise that you would be there when they
21   looked at the issue of cooperation?
22   A    No, he don't promise me something like that.
23   Q    Did he promise -- go ahead.
24   A    He promised me he will arise the issue of cooperation.
25   Q    He will what?
```

```
 1   A    Arise.

 2        THE COURT:  Raise.

 3   Q    Raise?

 4   A    Raise.

 5   Q    Who did he promise that he would raise it with?

 6   A    To agent Roudow.

 7   Q    With whom?

 8   A    To Agent Joe Roudow.

 9   Q    Who did Agent Roudow promise he would raise the issue of

10   cooperation with?

11   A    With this time was my lawyer, Lilia Felix, Agent Roudow,

12   and another agent, and me in that room.

13   Q    And he did --

14   A    He promised -- he told me over there that the issue of

15   cooperation that we will see the cooperation later on.

16   Q    He didn't promise that your sentence would be reduced, did

17   the agent?

18   A    It's my understanding that the issue of cooperation was

19   for reducing my sentence.

20   Q    Did Agent Roudow promise your sentence would be reduced?

21   A    No.

22   Q    Did your attorney, Mr. Elden, promise your sentence would

23   be reduced?

24   A    Yeah, with the issue of cooperation.  Yes.

25   Q    When did he promise that?
```

```
 1   A   From the very beginning.

 2   Q   When?  Give me a date.  What's the very beginning?

 3   A   The fifth week of May.

 4   Q   What year?

 5   A   2005.

 6   Q   That's before your plea of guilty, right?

 7   A   Yeah, was before.

 8   Q   Okay.

 9   A   At that time we was in San Diego.

10   Q   Right.  That was before you came to Hawaii, right?

11   A   Exactly.

12   Q   Okay.  And at the time --

13   A   So --

14   Q   Go ahead.

15   A   He told me we need to go to Hawaii and take care of the

16   case over here.

17   Q   That was in San Diego he told you those things?

18   A   Yes, sir.

19   Q   And when you came and pled guilty before Judge Seabright,

20   Judge Seabright asked you some questions, didn't he?

21   A   Yes.

22   Q   And he asked you if anybody had made any promises to you

23   that caused you to plead guilty, correct?

24   A   Correct.

25   Q   And you told him no, didn't you?
```

1   A    Correct.

2   Q    And you were under oath when you said that, correct?

3   A    Correct.

4   Q    Did Mr. Domingo promise you your sentence would be

5   reduced?

6   A    No.

7   Q    It was just Mr. Elden?

8   A    Yes, sir.

9   Q    And that was in San Diego when you first met him?

10  A    Yes, sir.

11  Q    Where in San Diego, at the Metropolitan Detention Center?

12  A    Yes, sir.

13       MR. MUEHLECK:  Nothing further.

14                    REDIRECT EXAMINATION

15  BY MR. ARAKAKI:

16  Q    Again, Mr. Cacho, the reason you pled guilty was because

17  you wanted to testify for your wife; isn't that correct?

18  A    Yeah, that's correct.

19  Q    And the reason why you filed a petition was because

20  Mr. Elden did not come to see you after sentencing as he

21  promised; isn't that correct?

22  A    Yeah, that's correct.

23       MR. ARAKAKI:  No further questions.

24       THE COURT:  You may step down sir, thank you.  Other

25  than Mrs. Cacho, which obviously we can't get to today,

1    Mr. Arakaki, do you have any other evidence?

2         MR. ARAKAKI:  I have nothing more.  Again, I will

3    be -- I believe we'll be getting more in the form of the phone

4    register before the next hearing date.

5         THE COURT:  All right.

6         Mr. Muehleck, do you want to --

7         MR. MUEHLECK:  Mr. Domingo is here.  Could we call

8    him?

9         THE COURT:  Do you have any objection, Mr. Arakaki?

10        MR. ARAKAKI:  None, Your Honor.

11        THE COURT:  All right.  This obviously is with without

12   prejudice, Mr. Arakaki, to you reopening your case.

13        Mr. Domingo.

14   (The testimony of William Domingo was not transcribed.)

15        THE COURT:  Anything further for today then?  Do you

16   have any other witnesses?

17        MR. MUEHLECK:  No, I don't have any other witnesses,

18   Your Honor.  Not standing by.

19        THE COURT:  All right, Mr. Muehleck, are you going to

20   call any other witnesses then?

21        MR. MUEHLECK:  I may very well.  I'd like to look at

22   my notes, but I think it will depend if the defense is going to

23   put on anything more.

24        THE COURT:  Well, he says he's going to put on

25   Mrs. Cacho.

1              MR. MUEHLECK:  Well, then we'll see what she says.

2              THE COURT:  Well, I think you know what she's going to

3    say though.

4              MR. MUEHLECK:  I do.

5              THE COURT:  I'd rather try to get this done.

6              MR. MUEHLECK:  Well, I can't get Mr. Elden here.  I

7    would have had him here today, Your Honor.  He's in a trial in

8    either the eastern district or the southern district of New

9    York, U.S. District Court, which has been scheduled quite

10   sometime.  And I told Ms. Miwa about this in February that we

11   would not have him here because of that.

12             THE COURT:  And I have no problem with that.  We could

13   try to hook him up by video as well.

14             MR. MUEHLECK:  That's fine.  We can try to do that,

15   although I suspect he would be willing to come.

16             THE COURT:  Well, I'll leave that to up to you.

17   Obviously, you can try to work through the U.S. attorneys

18   office, wherever he is, to see if he can get in there and do

19   the video hookup as well.

20             And Mrs. Cacho, you'll be talking to her today and

21   then to Mr. Muehleck about timing on this?

22             MR. ARAKAKI:  We're hoping that Friday morning we'll

23   be able to do this.  My first thought is to contact San Diego

24   again and also speak to Mr. Afuso and then see whether or not

25   there are possible video conference connections that we could

1    be making, other than with the marshals office there.  So I'll

2    be inquiring as well about that.  But I'll be speaking to

3    Mr. Afuso because he's left me with the impression that there

4    is a glitch, but he's not quite sure.  Maybe the next few days

5    could be something that would allow us --

6              THE COURT:  Well, you might try to get backup plans at

7    a Kinko's or something of that sort as well.  Now, let me ask

8    you, Mr. Arakaki, because I have to admit I'm somewhat

9    confused.  Your client is now saying that to the extent the

10   2255 says that the government or his attorney induced him to

11   enter a plea of guilty, he's not claiming that because he

12   wanted to plea guilty so he could testify against his wife --

13   I'm sorry, for his wife at trial.

14             MR. ARAKAKI:  That's correct.

15             THE COURT:  All right.  So that appears to be off the

16   table.

17             MR. ARAKAKI:  That's correct.

18             THE COURT:  All right.  And we have this letter from

19   Mr. Muehleck in April saying your cooperation isn't going to

20   get you anywhere, essentially.

21             MR. ARAKAKI:  I think the responsive letter by

22   Mr. Elden after that leaves open the question as to whether or

23   not the government would consider cooperation, despite that

24   initial letter.

25             THE COURT:  You mean, Mr. Elden is seeking that from

1    the government?

2        MR. ARAKAKI:  There was a response to Mr. Muehleck's

3    letter that was written by Mr. Elden, and Mr. Elden laid out a

4    number of things in that letter.  But in the end, it would

5    appear that he is asking Mr. Muehleck whether or not there was

6    still this possibility of cooperation.

7        THE COURT:  Well, I understand that, but read

8    Mr. Muehleck's letter, Mr. Mr. Muehleck is saying no.  I'm just

9    wondering what you get.  Even assume that you're right

10   factually, if I were to determine you're right, and that is --

11   I'm not talking about the appeal issue now.  I'm just talking

12   about cooperation, to the extent you've raised that.  If

13   Mr. Elden did not have contacts with your client --

14       MR. ARAKAKI:  I'm sorry, did?

15       THE COURT:  Did not.  In other words, if I accept that

16   on the cooperation issue, where does that get you?  What does

17   that do for you?

18       MR. ARAKAKI:  Your Honor, again, the reason why my

19   client, as he has testified to, filed this petition was because

20   he believed that Mr. Elden was going to assist him in

21   cooperation and come back to him and contact him.  From the

22   date of his sentencing -- and he sent a number of letters to

23   Mr. -- letters as well as phone calls that were made to

24   Mr. Elden's office, and Mr. Elden has not responded to this

25   date.

1          THE COURT:  I understand all of that.  But I'm not

2    some office of disciplinary counsel looking at Mr. Elden's

3    conduct.  I'm looking to see if there are any violations here

4    of your client's sixth amendment rights.  And what I'm getting

5    at is it seems to me Mr. Muehleck made a pretty clear statement

6    that the cooperation that he wanted to provide was not going to

7    result in a Rule 35 motion.  And so I don't know what it is

8    here that, even if you're right and if Mr. Cacho is right, even

9    if I accept that factually, what relief would you be seeking?

10         MR. ARAKAKI:  The relief that we're seeking is

11   Mr. Cacho wants to -- wants the opportunity to continue

12   cooperating.

13         THE COURT:  Is that on the table, Mr. Muehleck?

14         MR. MUEHLECK:  No, that's not on the table.

15         THE COURT:  See, I can't force the government to do

16   that.

17         MR. ARAKAKI:  I understand that, Your Honor, and

18   that's why in my particular supplement I asked if the

19   government would reconsider that situation, because of the fact

20   that my client believes that he can affect the apprehension of

21   Alejandro Gonzalez Guerrero who is still a fugitive.

22         THE COURT:  Mr. Muehleck, if he gives information that

23   does result in the apprehension, that's something that you

24   would at least take to the committee for determination; is that

25   right, as to whether he is entitled to the Rule 35?

```
 1            MR. MUEHLECK:  There are a lot of things we have to
 2    look at, Judge.
 3            THE COURT:  I don't want to get into this,
 4    Mr. Muehleck, and I'm not questioning your authority over my
 5    authority on this.  I'm not questioning that in the least.  And
 6    I don't think Mr. Arakaki is on a legal basis.  But if he can
 7    in fact provide information that leads -- that does lead to the
 8    arrest and apprehension of that individual, who is brought into
 9    federal court, and Mr. Arakaki asks for a committee meeting,
10    that's something you would at least do; is that accurate?  I'm
11    not saying what your determination would be.  I'm just saying a
12    meeting within your office to determine whether he is eligible
13    for a Rule 35.
14            MR. MUEHLECK:  I would discuss with my superiors the
15    position that was put on the table or some completed event;
16    that is, this guy got apprehended in Mexico and is now in the
17    United States.  I would discuss that, yes.
18            THE COURT:  Okay.  That's all I'm --
19            MR. MUEHLECK:  That's all.  But that's not the issue
20    of course that's in this petition.
21            THE COURT:  Well, it's sort of the issue that
22    Mr. Arakaki has now raised.  And it may not be my place and
23    maybe I'm overstepping somewhat, but what I'm trying to get at
24    is I don't think Mr. Muehleck is saying right now, Mr. Arakaki,
25    that if he is apprehended based on information that Mr. Cacho
```

1    provided that the door is a hundred percent closed.

2              MR. ARAKAKI:  Well, Your Honor, then I will assist my

3    client as best I can and try to open that door.  And that's

4    what I also put in my supplement that I'm willing to work with

5    the government and my client in that matter.  And I think --

6              THE COURT:  I don't know there's any remedy, even if I

7    agree with you as to what Mr. Elden did.

8              MR. ARAKAKI:  I understand.  But I also understand

9    that if that opportunity is made available to him, I think this

10   petition and everything else is something that he is willing to

11   set aside.  That's what I believe.  He just wants an

12   opportunity to go forward with a promise that was made to him

13   by Mr. Elden.

14             MR. MUEHLECK:  Well, that assumes something that's not

15   been determined yet, first of all.  Secondly, let's put all of

16   our cards on the table.  Our position is that the defendant

17   lied repeatedly at the trial of his wife.  That's obstruction.

18   To then come back and say after that that if someone is

19   arrested in Mexico by Mexican authorities who already have a

20   duty to do that --

21             THE COURT:  Well, I don't know that --

22             MR. MUEHLECK:  That he would get cooperation,

23   assistance on that?

24             THE COURT:  Mr. Muehleck, I don't know all the facts.

25   Again, I don't want to assert myself in that because I should

 1    not do that.

 2            MR. MUEHLECK:  And it's not in the petition that's

 3    before the court.

 4            THE COURT:  It's not in the petition.  But on the

 5    other hand, if he can help in a way that results in the

 6    apprehension of this individual, that serves justice overall,

 7    Mr. Muehleck.  And I don't think you dispute that.  And if that

 8    were to happen, I think it's fair for Mr. Arakaki to ask you at

 9    least to have that discussion with your supervisors to

10    determine what appropriate course to take.

11            Now, on the venue issue, Mr. Arakaki, I did want to

12    raise a case with you.  In United States versus Mendoza 108

13    F.3d page 1155, that's 108 F.3d 1155, U.S. versus Mendoza.  And

14    what Mendoza says is a challenge to venue pretrial cannot

15    include facts outside the indictment.

16            In other words, we don't have summary judgment

17    proceedings essentially in criminal cases.  So you look at the

18    face of the indictment and treat all facts as true.  And only

19    if facially venue isn't set forth on the indictment can it be

20    challenged pretrial.  Otherwise, it has to be challenged at a

21    trial.  And your client pled guilty for various reasons and

22    said under oath, very inconsistent with his testimony here, he

23    did not plead guilty because of his wife but was pleading

24    guilty because he was guilty of the offenses, and he wanted to

25    plead guilty to them.

1        So the claim that pretrial venue wasn't raised it

2  seems to me he can't show any prejudice because he couldn't

3  prevail on a pretrial motion to a challenge for venue.

4        MR. ARAKAKI:  Your Honor, what I did explain to my

5  client regarding the venue matter was that I have, in the past,

6  in this court -- well, in this district court, filed such

7  motions as change of venue, and I let him know that, based upon

8  my review of this matter, this particular issue regarding venue

9  is not something that he should hang his hat on basically from

10  what I have reviewed of the venue issue.  And he understood

11  that.

12        THE COURT:  Well, I just want to make that --

13        MR. ARAKAKI:  And I think I use that in -- I think

14  Mendoza was one of the cases I might have cited in my own

15  motion and memorandums in venue issues and my request for a

16  change of venue.  So I'll go over with him again on that

17  matter.

18        THE COURT:  Now, Mr. Arakaki, I have your original

19  Cingular billing.  Do you want that back?

20        MR. ARAKAKI:  I have a good copy that was made by

21  Mr.  Muehleck.  I think we'll --

22        THE COURT:  I can hold on to that then?

23        MR. ARAKAKI:  Yes.

24        THE COURT:  All right.  Mr. Muehleck, as far as your

25  witnesses, if you can just work with Mr. Arakaki then on the

1    continued date, have available what you are able to have

2    available on that date.  And if, for instance, you want to call

3    Mr. Elden but he is not available because he is in trial, then

4    we'll have to continue that.  If you want to call Agent Roudow

5    and he is around, then obviously you can bring him in or anyone

6    else that you believe you need to call.

7            In other words, do your best to get your witnesses

8    here on the date that you two agree to based on

9    Mrs. Cacho's continued -- or the beginning of her testimony.

10           MR. MUEHLECK:  Well, are we going to set a date for

11   Mrs. Cacho?  We'll come in.  Are we going to set a date for

12   Mrs. Cacho?

13           THE COURT:  We can set it for Friday morning right

14   now.

15           MR. MUEHLECK:  Let's do that.

16           THE COURT:  Then work through that.  And if there are

17   continuing problems, then we'll take it up.

18           MR. MUEHLECK:  Right.  So I can at least tell my

19   witness that we have another witness going on on Friday, what's

20   your availability on Friday, whatever.  And the time frame, six

21   hours ahead, Judge, if he is still in New York, and I

22   understand he is on a trial, it was going to be several weeks,

23   I'll try to find out.  I don't know.

24           THE COURT:  Okay, 9:00 on Friday then.  If you two run

25   into difficulties but agree on another date, you can talk to

1    Ms. Miwa, and we can work it out if there are continuing

2    problems.

3              MR. MUEHLECK:  All right. Thank you, Your Honor.

4              THE COURT:  And if Mr. Elden is available as of like

5    5:00 his time, Mr. Muehleck, by video conference, maybe we can

6    do it.  That would be 11:00 our time.

7              MR. MUEHLECK:  Okay.

8              THE COURT:  Anything further?

9              MR. ARAKAKI:  Nothing further, Your Honor.

10             THE COURT:  All right, court is in recess.

11   (Recess at 10:52 a.m. )

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I, Gloria T. Bediamol, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that the foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7          DATED at Honolulu, Hawaii, May 20, 2008.

8

9

10                              /s/ Gloria T. Bediamol

11                              GLORIA T. BEDIAMOL.

12                              RPR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25